16 A.3d 1076 (2011)
419 N.J. Super. 244
Nicholas SAFFOS, Plaintiff-Respondent/Cross-Appellant,
v.
AVAYA INC. and M. Foster Werner, Jr., Director of Avaya Global Real Estate and Individually, Defendants-Appellants/Cross-Respondents.
No. A-3189-08T2
Superior Court of New Jersey, Appellate Division.
Argued May 12, 2010.
Decided March 8, 2011.
*1080 Kevin C. Donovan argued the cause for appellants/cross-respondents (Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P., Caitlin J. Halligan (Weil, Gotshal & Manges, L.L.P.) of the New York bar, admitted pro hac vice, and Gregory Silbert (Weil, Gotshal & Manges, L.L.P.) of the New York bar, admitted pro hac vice, attorneys; Mr. Donovan, Gregg S. Kahn, Newark, Ms. Halligan, and Mr. Silbert, on the briefs).
Patricia Breuninger argued the cause for respondent/cross-appellant (Breuninger & Fellman, attorneys; Ms. Breuninger, Susan B. Fellman, Scotch Plains, and Kathleen P. Ramalho, on the brief).
Before Judges CUFF, C.L. MINIMAN and FASCIALE.
The opinion of the court was delivered by
MINIMAN, J.A.D.
Defendants Avaya, Inc. (Avaya), and M. Foster Werner, Jr. (Werner), appeal from a judgment in favor of plaintiff Nicholas Saffos in the amount of $5,633,707.37, inclusive of prejudgment interest, costs, and attorneys' fees. Plaintiff cross-appeals from a $6,285,000 reduction in the amount of the punitive-damage award. We affirm in all respects save the quantum of punitive damages; the attorney-fee lodestar, which we modify; and the award of a contingency-fee enhancement, which we reverse.

I.
Plaintiff, born in 1954, began working for AT & T in 1983 in the corporate real estate department. AT & T created Lucent Technologies (Lucent) to take over the business of Bell Laboratories. In 1995 or 1996, plaintiff transferred to Lucent's real estate department. Avaya was created in 2000 to take over the Business Communications unit of Lucent. Plaintiff then moved into Avaya's Global Real Estate (AGRE) group as a Business Relationship Manager with an annual salary of $83,000. AGRE worked to provide suitable real estate *1081 for Avaya's divisions and global affiliates, and to control real estate costs.
On May 20, 2002, Werner was hired as AGRE's director. AGRE had about twenty-four employees at that time. At trial, Werner claimed that AGRE had hired him to improve its reputation, performance, and profitability and testified that he was to reduce costs. He decided to hire people that he personally knew or people recommended by acquaintances he knew and respected.
Upon arriving in Basking Ridge, Werner began reorganizing the office and restructuring AGRE. He changed the names of titles and asked off-site employees to relocate to New Jersey. He also began eliminating AGRE employees who had been holdovers from Lucent and AT & T. First, Werner placed Lee Gruhin, age forty and a twelve-year veteran of Avaya and its predecessors, on a one-month performance improvement plan (PIP), after which he was terminated on August 1, 2002, for "unsatisfactory performance" despite always having had solidly good prior performance reviews.[1] Gruhin was replaced by Mark Kennedy, age forty-four, who transferred into AGRE from Avaya's finance department approximately six months later.
Werner next fired four employees under a Forced Management Plan (FMP), including Nancy Glenn, age forty-seven, and Steve Sarasin, age forty-three. An FMP supposedly eliminates positions to create cost savings. Glenn, who was a twenty-one-year veteran of Avaya and its predecessors, had always received exceptional performance evaluations and IPF scores.[2] She was working in Colorado and offered to relocate to New Jersey at her own expense, but Werner refused, advising her that there was no money for moving.
When Glenn saw an internal posting of her job on Avaya's system, she complained to the Human Resources Department (HR), but they told her she did not have a case and to "have a good life." On September 29, 2002, while still on Avaya's payroll, she sent an email describing Werner's actions to Amar Pai, Werner's supervisor, the Vice President of Finance Operations and Corporate Controller. Glenn never received a response.
Despite having ostensibly eliminated four positions with the FMP, Werner soon replaced Glenn and Sarasin with Eileen Grippo, age thirty-three, and Nina Caputo, age thirty-four. When Caputo was hired, Werner authorized payment of her relocation expenses, unlike Glenn.
In or about January 2003, Werner told Robert Goeller, age forty-one and a Lease Administrator, to develop a PIP to make "major improvements" to his performance based on an evaluation dated November 2002. He then fired him on February 28, 2003, for unsatisfactory performance and replaced him with Michele Costa, age twenty-eight.
Grippo, who replaced Glenn, testified that Werner created a divisive environment at AGRE. The department was divided into two "camps," the older employees in one group and the younger employees in a totally separate, "favored" group. "It was clear as day." She explained that Werner insulted the older employees behind their backs but was charming and flattering to the younger ones, frequently *1082 asked the younger group to join him for lunch, and had them accompany him to corporate meetings, all to the exclusion of the older group.
Werner especially "abused" Susan Bernarducci, age fifty-one, his administrative assistant. When Grippo complained about the different camps to Werner, he started ignoring her. Consequently, she soon resigned, because "[i]t was not a pleasant place to come to work" and Werner "abused people."
In Werner's deposition, read to the jury, he testified that Grippo left AGRE because she was unhappy working with plaintiff due to plaintiff's "complete lack of oral and written communication skills." Grippo flatly denied this at trial, saying, "Not true." Grippo also testified that plaintiff, who had been doing the work of two or three people before she arrived, "seemed to do his job really well." Although he had a "quirky type of communication" style and "talked slow[ly] and deliberate[ly]," he "served his clients very well" and "had a good rapport with them."
Tom Cotter and Mike Ahnell, outside contractors who worked for United Systems Integrators (USI) at AGRE's offices, both testified about Werner's favored treatment of his younger, mostly female, new hires. Werner frequently yelled at Bernarducci and often brought her to tears. The office "was kind of a hostile atmosphere." If you were not part of Werner's "little inner circle" comprised of the new younger people he had hired, you "were clearly on the outside." Everyone seemed "a bit frightened."
Plaintiff had received more-than-favorable performance reviews in the past. Cotter testified that plaintiff had been "an excellent employee," was "well organized," and all of his clients were happy. One of plaintiff's "strengths" was his communication skills. Ahnell from USI had also worked with plaintiff and found him to be "competent" and "able to address the needs of the job." Ahnell never had any problems with plaintiff's communication skills.
Cotter and Ahnell testified that Werner was very critical of Bernarducci's skills, saying that she "couldn't even do a simple business letter." Werner moved Bernarducci to a new position, Business Analyst II, and then ignored her requests for guidance on her new responsibilities. Werner soon put her on a PIP and then terminated her employment for poor performance shortly thereafter. Bernarducci testified that her complaints to HR about how she was being treated were ignored.
Courtney McGough, age thirty-three, replaced Bernarducci as Werner's assistant. She was hired in December 2002 as a "Real Estate Coordinator" but was quickly promoted to a Business Relationship Manager after Grippo resigned. Werner then filled McGough's former position with Kerri Hollick, age twenty-eight, and later with Jennifer DeSilva, age twenty-two.
Werner soon began examining plaintiff's work. In fact, when Werner first arrived at Avaya in 2002, Werner gave plaintiff a "fairly favorable" evaluation and a raise. Despite that 2002 evaluation, in 2003 Werner suddenly found plaintiff to be verbose with a meandering style of communication that was confusing to colleagues and clients. He complained that plaintiff "used big words that weren't necessary" in business, such as "trenchant," "salient," "vanquished," "transmuting," and "fathom."
Werner complained that plaintiff failed to tell him about business problems in a timely fashion and refused to get proper approvals before sending documents to clients. For example, in early September 2002, plaintiff failed to notify him that Avaya was in danger of having a substantial *1083 penalty assessed against it because one of its clients in Mexico City had not signed a lease renewal. However, plaintiff testified that he had received the required lease extensions before he left work; thus, there was no risk of any penalties.
Werner also complained that plaintiff emailed internal work-product documents to clients before they were approved and told clients that they could explore other sites on their own. Werner said that these actions violated "policies" that he had established, but admitted he had never documented the alleged "policies." Werner also claimed that he was told by plaintiff's coworkers that clients were unhappy with plaintiff's work.
Based on the foregoing "concerns," Werner placed plaintiff on a PIP on August 26, 2003. He told plaintiff that he had problems with "his writing style, which was not a normal business writing style," and his attitude was inappropriate. He gave plaintiff one month to improve and said he needed to devise his own improvement plan. Plaintiff repeatedly asked Werner for guidance, but Werner ignored his request to see the work product of a "more favorably reviewed associate" for comparison. Consequently, plaintiff was forced to write his own plan, using what he thought were criticisms from his review and adding weekly steps he would take to correct them.
At their first PIP meeting, Werner found plaintiff's plan to be "incomplete," although he made no other criticisms of plaintiff's performance. Werner claimed that plaintiff was not taking the PIP seriously. As a result, Werner gave plaintiff several job openings to explore. Werner terminated plaintiff's employment on September 26, 2003. Plaintiff was forty-nine years old.
Werner replaced plaintiff with Carol Puleo Clark, age thirty-five, who had very little real estate experience. Thereafter, Werner fired John Cook,[3] age forty-seven, and Prahans Amin, age thirty-three, for "poor performance." Werner replaced Cook with Simon Ford, age thirty-four.
For each employment action, Werner consulted Ann Marie Judice Bane, his HR liaison. Bane testified that part of her job was "coaching" managers on how to terminate employees and minimize the risk of a lawsuit. Werner said that she "guided" him through the termination process for each employee. For example, Bane told Werner that he could not fire plaintiff under an FMP because they wanted someone new to fill his position. Instead, she told Werner to put plaintiff on a PIP. When Bane raised a concern that Werner was hiring new people who had little or no real estate experience, Werner told her that he knew what he was doing after thirty years in the industry. Bane admitted that Avaya did not use PIPs as standard personnel procedures; they were "more of a Lucent Technologies process."
Werner admitted that he had failed to institute a PIP for Billy Karras, age thirty-three, after Karras indisputably violated AGRE's written code of conduct and accounting control policy. Instead, he gave Karras a "warning" and never fired him. Werner also had given Grippo, age thirty-three, a warning after she met with a client without Werner's prior approval.
In July 2004, Werner's supervisor, Pai, fired him at age fifty-five for poor performance and then replaced him with Andrew Fellouris, age forty. Werner filed an age-discrimination claim against Avaya, which it settled before trial in this matter. The judge permitted the jury to hear testimony about this settlement because it was *1084 relevant to Werner's credibility but failed to give the jury a limiting instruction on its use.
Although Pai, Werner's supervisor, had been aware of Werner's actions and eventually fired him, Pai said that he "trusted [his] evaluation of his people and his team." He claimed that he never instructed Werner to fire older people or hire younger ones, and he never heard anyone say that Werner had a bias against older employees (despite the email Glenn sent to him in September 2002).
In excerpts from Werner's deposition that were read to the jury, he testified that he believed that Pai was concerned that age was a detriment at Avaya and preferred younger workers. In his own discrimination suit, Werner stated that Pai engaged in a general pattern of firing older workers and hiring younger ones.
[At the direction of the court and for the sake of brevity, four paragraphs in Section I have been omitted from the published version of the opinion.]
The jury was presented with a chart demonstrating that the average age of AGRE's workforce after two years of Werner's leadership was ten years younger than it had been before he arrived. In all, nine employees were terminated, and eight were hired as replacements.

II.
The jury returned a verdict in plaintiff's favor, awarding him $250,000 for his emotional distress; $325,500 for back pay; and $167,500 for front pay. On June 17, 2007, the judge found sufficient facts for the jury to consider punitive damages. The parties stipulated Avaya's value at $4 billion, and the jury awarded $10,000,000 for punitive damages. First, the judge entered an order of judgment on the jury's compensatory damages award and ordered defendants to pay $93,278.37 for prejudgment interest on the awards for emotional damages and lost back pay. Second, the judge considered defendants' motion for judgment notwithstanding the verdict (JNOV) or for a new trial and remitted the punitive-damage award to $3,715,000 (five times the compensatory award). He subsequently awarded $843,638 for attorneys' fees; $210,909 as a twenty-five percent fee enhancement; and $27,882 for costs, bringing the total judgment to $5,633,707.37. Defendants appealed these rulings, and plaintiff cross-appealed the remittitur of the punitive-damage award. The parties have raised the following issues for our consideration.
[For the sake of brevity, we have here redacted the discussion of a number of issues respecting liability and compensatory damages raised by defendants that we have decided in a separate opinion. Additionally, we summarize the remaining issues as follows: Defendants assert that (a) the remitted punitive-damage award was unjustified because plaintiff failed to show that Avaya's conduct was "especially egregious"; (b) the remitted award is unconstitutionally excessive since Avaya's conduct was not reprehensible; (c) the judge erred in allowing punitive damages in excess of the compensatory award; and (d) the award greatly exceeded comparable civil penalties. Last, they argue that (a) the attorney-fee award should be barred because the retainer agreement violated the Rules of Professional Conduct (R.P.C.); (b) the lodestar was excessive; and (c) the fee enhancement was likewise excessive.]
Plaintiff disputes each of the issues raised by defendants and contends on his cross-appeal that the punitive damages *1085 awarded by the jury did not contravene New Jersey's Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9 to -5.17, because the Legislature excepted punitive-damage awards for violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, from the PDA cap. Further, he argues that the punitive-damage award conformed to the requirement of the federal and state constitutions.
Our appellate review is limited by well-settled, controlling principles. Sebring Assocs. v. Coyle, 347 N.J.Super. 414, 424, 790 A.2d 225 (App.Div.), certif. denied, 172 N.J. 355, 798 A.2d 1269 (2002). "We are not to review the record from the point of view of how we would have decided the matter if we were the court of first instance." Ibid. (citation omitted). "Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974) (citation omitted).
"While we will defer to the trial court's factual findings so long as they are supported by sufficient, credible evidence in the record, our review of the trial court's legal conclusions is de novo." 30 River Court E. Urban Renewal Co. v. Capograsso, 383 N.J.Super. 470, 476, 892 A.2d 711 (App.Div.2006) (citing Rova Farms, supra, 65 N.J. at 483-84, 323 A.2d 495; Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995)).
[At the direction of the court and for the sake of brevity, the last paragraph of Section II and the entire Section III have been omitted from the published version of the opinion.]

IV.
We next consider the issues respecting the award of punitive damages in this case. Defendants contend that the judge erred by refusing to vacate the jury's punitive-damage award or, alternatively, by failing to remit that amount to a sum equal to the compensatory damages, that is, $742,500. In his cross-appeal, plaintiff seeks reinstatement of the jury's $10 million award on the ground that it was constitutional and fair.
In his written decision on punitive damages, the judge concluded that the jury had sufficient evidence to find that plaintiff "was the victim of a scheme carried out by... Werner and ordered [by Pai] or [in which he] at least acquiesced." This "scheme" was directed at plaintiff and "at a number of older employees who were fire[d] pretextu[ ]ally and replaced by younger employees." Eight people went into "remediation" and "were terminated [and] replaced largely by younger employees." He further found that "[m]ost of the employees terminated were long-term employees. All had good records of past performance prior to Werner coming on the scene, and were then subject[ed] to a hostile work environment created by ... Werner focused against the older employees while he openly favored new hires."
The judge found defendants' conduct "reprehensib[le]," concluding that "the facts justify a finding that the scheme to replace older employees with younger employees was put into place by Avaya to create a new approach to management of the company[,] which was apparently in serious financial condition when these acts occurred." Indeed, the evidence demonstrated to the judge that:
the management of Avaya ... [was] keenly aware of the mandated public policy that termination should not be made on the basis of age. Therefore, Werner with the aid of the Human Resources person, [Bane,] and with the *1086 tacit approval, at least, of ... Pai, created a scheme to create a recent record of poor performance, put [plaintiff] and others through a remediation process so that [Avaya] could claim some compliance with the policy against age discrimination and then terminated the employees shortly thereafter, replacing them largely by younger persons. The facts certainly justify a finding that this was a carefully orchestrated scheme in which the defendants were aware of their potential liability and tried to mask it by the process described and to create a hostile environment for those persons wh[o] were not part of the defendants' new team. The facts would certainly justify a finding therefore that defendants were aware of New Jersey's strong policy, as expressed in the LAD against any type of discrimination, and that there was a concerted effort to engage in that practice and tried to mask the wrongful acts by implementing a scheme to rid themselves of older employees in defiance of those policies. Thus, it would appear that the acts were perpetrated not only against [plaintiff], but on a division-wide basis with full knowledge of the requirements imposed by the LAD.
In addition, "[t]he effects on ... plaintiff appear to have been devastating." The judge found that:
After some 20 years with the company or its predecessors without a single negative review, except by Werner, [plaintiff] was subjected to the treatment described and terminated without pension or benefits at the age of 49. The evidence justified a finding that [plaintiff] was deeply affected by it both during the time he was on the job and the period that followed thereafter and suffered substantial emotional distress, not only in being terminated from the job that he had held for so long, but by his inability to be able to find comparable employment.... [P]laintiff described in detail his efforts and lack of success in obtaining suitable employment. He finally secured a franchise start-up business by means of personal savings and loans[,] and it was projected that some time in the near future, he would be able to achieve comparable compensation in his business. It would appear then that between the damage done to plaintiff in this case [and] comparable employees from Avaya ... and the attempt by ... defendants to mask their discrimination by a sham compliance with non-discriminatory standards that something more than some financial harm to ... plaintiff was done under the circumstances.
With respect to "the impact that punitive damages would have on ... defendants," the judge stated:
It was stipulated during the course of the trial that Avaya is a corporation worth approximately $4[ ] billion dollars. There was some argument that based on recent yearly reports that the true value was close to something like $7[ ] billion dollars. Considering the worth of the corporation, consideration has to be given to the impact that a fine would have on ... defendants and [e]nsure [their] future compliance with non-discriminatory standards. A token punitive damages award would simply be viewed as the cost of doing business and would be unlikely to deter ... defendants from engaging in these practices in the future.
Finally, the judge concluded that, "[b]ased on the guidelines set forth in [Gore[4]] and in Baker[5] and by our punitive *1087 damage statut[ory] scheme," a punitive-damage award of five times the compensatory-damage award "would be appropriate under the circumstance"; thus, he remitted the $10,000,000 award to $3,715,000. "This award would then represent on the one hand a significant message to [Avaya], but would not offend ... defendant[s'] right to due process. A multiplier of 13.46 is excessive even considering the pervasive discrimination and the worth of [Avaya]."

A.
In New Jersey, an award of punitive damages in a LAD action is governed initially by that act. N.J.S.A. 10:5-3. However, punitive damages in a LAD case are also governed by New Jersey's PDA. Although such damages are not subject to the PDA's cap on punitive damages of five times the compensatory damages, they are subject to its general procedural requirements. N.J.S.A. 2A:15-5.14(c); Baker, supra, 161 N.J. at 231, 736 A.2d 462. The PDA requires juries to consider the following factors:
(1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;
(2) The defendant's awareness [or] reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;
(3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and
(4) The duration of the conduct or any concealment of it by the defendant.
[N.J.S.A. 2A:15-5.12(b).]
When a punitive-damage award is made, a trial judge is required to determine whether the jury's award is "reasonable" and "justified in the circumstances of the case"; if not, the judge must reduce or eliminate the award. N.J.S.A. 2A:15-5.14(a).
"The statute does not appear to substantially alter the common law regarding punitive damages." Catalane v. Gilian Instrument Corp., 271 N.J.Super. 476, 500, 638 A.2d 1341 (App.Div.), certif. denied, 136 N.J. 298, 642 A.2d 1006 (1994). "[P]unitive damages are only to be awarded in exceptional cases even where the LAD has been violated." Id. at 500-01, 638 A.2d 1341 (citing Weiss v. Parker Hannifan Corp., 747 F.Supp. 1118, 1135 (D.N.J. 1990)). To be exceptional, the defendant's conduct must "ris[e] to the level of wanton or reckless conduct." Id. at 501, 638 A.2d 1341. In other words, plaintiff must demonstrate "exceptional or outrageous action to recover such damages," Maiorino, supra, 302 N.J.Super. at 353, 695 A.2d 353, and must offer "proof that the offending conduct [was] especially egregious," Rendine v. Pantzer, 141 N.J. 292, 314, 661 A.2d 1202 (1995) (citation and internal quotation marks omitted). Additionally,
in LAD cases, punitive damages can only be assessed against an employer if there was "actual participation by upper management or willful indifference." Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 625 [626 A.2d 445] (1993) (citation omitted). See also Maczik v. Gilford Park Yacht Club, 271 N.J.Super. 439, 446 [638 A.2d 1322] (App.Div.) ("Unlike compensatory damages, punitive damages under LAD can be imputed to an employer or other entity only `in the event of actual participation by upper management or willful indifference.'" (citation omitted)), certif. denied, 138 N.J. 263 [649 A.2d 1284] (1994).
[Maiorino, supra, 302 N.J.Super. at 354, 695 A.2d 353.]
"`Our cases indicate that the requirement [of willfulness or wantonness] may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability *1088 of harm and reckless indifference to consequences.'" Rendine, supra, 141 N.J. at 314, 661 A.2d 1202 (alteration in original) (quoting Berg v. Reaction Motors Div., 37 N.J. 396, 414, 181 A.2d 487 (1962)). "The key to the right to punitive damages is the wrongfulness of the intentional act." Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49, 477 A.2d 1224 (1984).
The judge did not err in refusing to vacate the award, as there was sufficient evidence to show defendants' especially egregious conduct. The evidence supports a finding of willful indifference, if not active participation by Avaya's upper management. Werner engaged in an intentional scheme of especially egregious age discrimination, which was conducted maliciously against plaintiff and others under the pretext of terminations for poor performance. This was not an isolated act of age discrimination, but a division-wide scheme to terminate older workers, which created a hostile work environment in the process. Pai, Werner's supervisor and a member of upper management, was clearly aware of Werner's conduct and willfully indifferent to it. We are satisfied that there was "`a legal foundation in the record for an award.'" Catalane, supra, 271 N.J.Super. at 501, 638 A.2d 1341 (citing Weiss, supra, 747 F.Supp. at 1136 n. 6).
We are also satisfied that the judge properly applied the PDA to determine whether the jury's punitive-damage award was "reasonable" and "justified in the circumstances of the case," and, if not, to reduce or eliminate the award. N.J.S.A. 2A:15-5.14(a). In this case, he found that it was justified under the circumstances of this case but was not reasonable. We find no abuse of discretion in this respect and find plaintiff's arguments to the contrary in support of his cross-appeal to be lacking in merit.

B.
Defendants next challenge the punitive-damage award on substantive due-process grounds. Where a constitutional challenge is raised, we are required to conduct a de novo review of the trial court's application of recognized due process principles to an award of punitive damages. Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 435-36, 121 S.Ct. 1678, 1685-86, 149 L.Ed.2d 674, 686-87 (2001). This is consistent with our jurisprudence because we review questions of law de novo. Manalapan Realty, supra, 140 N.J. at 378, 658 A.2d 1230.
"Exacting appellate review ensures that an award of punitive damages is based upon an `"application of law, rather than a decision[ ]maker's caprice."'" State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 1520-21, 155 L.Ed.2d 585, 601 (2003) (quoting Cooper Indus., supra, 532 U.S. at 436,121 S.Ct. at 1685, 149 L.Ed.2d at 687).
The Due Process Clause of the Fourteenth Amendment imposes limits on "the broad discretion that States possess with respect to the imposition of criminal penalties and punitive damages." Cooper, supra, 532 U.S. at 433, 121 S.Ct. at 1684, 149 L.Ed.2d at 685. "That clause makes the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishments applicable to the States." Id. at 433-34, 121 S.Ct. at 1684, 149 L.Ed.2d at 685 (citation omitted). Those limits have been enforced, inter alia, to deprivations of property. Id. at 434, 121 S.Ct. at 1684, 149 L.Ed.2d at 685. This is so because "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the *1089 severity of the penalty that a State may impose." Gore, supra, 517 U.S. at 574, 116 S.Ct. at 1598, 134 L.Ed.2d at 826 (footnote omitted).[6]
The Supreme Court has most recently addressed an award of punitive damages under state law in Campbell, supra, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585. It observed that punitive-damage "awards serve the same purposes as criminal penalties, [yet] defendants subjected to punitive damages in civil cases have not been accorded the protections applicable in a criminal proceeding." Id. at 417, 123 S.Ct. at 1520, 155 L.Ed.2d at 601. This caused the Court increased "concern[] over the imprecise manner in which punitive damages systems are administered." Ibid.
The Campbell Court reiterated the three guideposts that courts must consider in reviewing punitive-damage awards:
(1) the degree of reprehensibility of the defendant's misconduct;
(2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and
(3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.
[Id. at 418, 123 S.Ct. at 1520, 155 L.Ed.2d at 601 (citing Gore, supra, 517 U.S. at 575, 116 S.Ct. at 1598-99, 134 L.Ed.2d at 826).]
Our Supreme Court applied the Gore standard in Baker, supra, 161 N.J. 220, 736 A.2d 462, when it declared that, "to ensure that any award of punitive damages bears `some reasonable relation' to the injury inflicted," id. at 231, 736 A.2d 462, courts reviewing punitive-damage awards in LAD cases should apply (1) the PDA's "general requirements for procedural and substantive fairness," id. at 229, 736 A.2d 462; and (2) Gore's three constitutional factors, id. at 231, 736 A.2d 462.
With respect to the first guidepost, the Campbell Court observed:
"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, [supra, 517 U.S. at 575, 116 S.Ct. at 1599, 134 L.Ed.2d at 826]. We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. Id. at 576-577[, 116 S.Ct. at 1599-1600, 134 L.Ed.2d at 826-27]. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. Id. at 575[, 116 S.Ct. at 1599, 134 L.Ed.2d at 826].
[Campbell, supra, 538 U.S. at 419, 123 S.Ct. at 1521, 155 L.Ed.2d at 602.]
*1090 Our PDA requires courts to consider similar factors.[7]
Here, defendants' conduct was reprehensible. Although the harm was economic, Avaya disregarded the mental health of defendant and other older workers[8] when Werner, with his supervisor's acquiescence, mounted a deliberate, systematic campaign to terminate the employment of the division's older employees, including plaintiff, under the pretext of poor performance, and then covered up his unlawful age discrimination, with advice of management, by using a sham PIP procedure, which Avaya did not officially employ, and which was never instituted when younger employees undeniably violated similar company policies, despite a letter to Pai complaining of this conduct. Werner further created a hostile work environment by excluding older workers from meetings and lunches. Plaintiff was certainly financially vulnerable as the termination of his employment wrecked havoc with his standard of living and his financial security. Werner's conduct and Avaya's indifference to it involved repeated actions and not mere accidents.
"[E]vidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." Gore, supra, 517 U.S. at 576-77, 116 S.Ct. at 1599, 134 L.Ed.2d at 827 (citation omitted). Additionally, their conduct violated long-established and clear statutory mandates under the LAD. Thus, under Campbell, Gore, and Baker, defendants' actions were reprehensible, despite the absence of physical harm.
Next, we must consider the disparity between the actual or potential harm to plaintiff and the punitive-damage award. Campbell, supra, 538 U.S. at 418, 123 S.Ct. at 1520, 155 L.Ed.2d at 601. The actual harm here was one-fifth the modified punitive-damage award. Defendants urge that such damages may not exceed a one-to-one ratio. Plaintiff contends that such a ratio is not mandated by Campbell and a higher ratio is permitted by the PDA and the LAD.
The Supreme Court "ha[s] been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." Id. at 424, 123 S.Ct. at 1524, 155 L.Ed.2d at 605 (citations omitted). However, the Court observed that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Id. at 425, 123 S.Ct. at 1524, 155 L.Ed.2d at 605-06 (noting four-to-one ratio "might be close to the line of constitutional impropriety").[9] However, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps *1091 only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Id. at 425, 123 S.Ct. at 1524, 155 L.Ed.2d at 606.[10]
"[T]he measure of punishment [must be] both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." Id. at 426, 123 S.Ct. at 1524, 155 L.Ed.2d at 606. In making that determination, we must recognize that emotional distress damages often contain a punitive element. Id. at 426, 123 S.Ct. at 1525, 155 L.Ed.2d at 606-07. We are satisfied that is the case here.
Plaintiff did not suffer any physical harm from the emotional distress he endured nor did he require psychiatric or psychological treatment; yet recovery for such damages is permitted under the LAD. Tarr v. Ciasulli, 181 N.J. 70, 82, 853 A.2d 921 (2004). However, where physical harm and treatment is absent, the risk of a punitive aspect in the damages for emotional distress is greater. As such, we are satisfied that they should have been excluded from the ratio of compensatory to punitive damages, leaving a compensatory-damage base of $493,000. Nonetheless, we are satisfied that the five-to-one ratio here was appropriate based on the conduct we have already discussed and because Werner's conduct targeted a class of workers, not just plaintiff, and Werner and Avaya displayed a complete disregard of the LAD. This is within the "normative punishment" of the PDA's fixed proportional ratio. Baker, supra, 161 N.J. at 231, 736 A.2d 462. A one-to-one ratio yielding a $493,000 punitive-damage award would not be sufficient in the future to deter such conduct by Avaya and its managers given the level of defendants' knowingly unlawful conduct. This is so because punitive damages are "aimed at deterrence and retribution," Campbell, supra, 538 U.S. at 416, 123 S.Ct. at 1519, 155 L.Ed.2d at 600 (citations omitted).
Last, we consider the difference between the punitive damages awarded and the civil penalties authorized by the LAD. Id. at 418, 123 S.Ct. at 1520, 155 L.Ed.2d at 601. We recognize that such penalties are not great; however, this is not an isolated act of discrimination but one that was part of a department-wide scheme. We find this comparison not particularly helpful in determining the propriety of the amount of punitive damages. As such, the judgment shall be amended to reduce punitive damages to $2,465,000.

V.
We next consider defendants' contention that the judge erred in awarding counsel fees to plaintiff. They claim that the entire fee award must be vacated due to an unethical provision in the retainer agreement between plaintiff and his counsel or, alternatively, that the lodestar and contingency-fee enhancement must be significantly reduced.
Rule 4:42-9(a)(8) governs counsel fees where they are permitted by statute. Additionally, R.P.C. 1.5(a) commands that "[a] lawyer's fee shall be reasonable." Under the LAD, a fee-shifting statute, Pinto v. Spectrum Chemicals & Laboratory Products, 200 N.J. 580, 584, 985 A.2d 1239 (2010), the prevailing party "may be *1092 awarded a reasonable attorney's fee." N.J.S.A. 10:5-27.1.
The "first step in the fee-setting process" is for the judge to calculate "the `lodestar:' the number of hours reasonably expended multiplied by a reasonable hourly rate." Rendine, supra, 141 N.J. at 334-35, 661 A.2d 1202. This is "the most significant element in the award of a reasonable fee," and the judge must "evaluate carefully and critically the aggregate hours and specific hourly rates advanced by counsel for the prevailing party." Id. at 335, 661 A.2d 1202. "Trial court[]s should not accept passively the submissions of counsel to support the lodestar amount[.]" Ibid. Hours not reasonably expended should be excluded. Ibid. (quoting Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir.1990) (internal citations omitted)). The court may also "`reduce the hours claimed by the number of hours spent litigating claims on which the party did not succeed ... that were distinct in all respects from claims on which the party did succeed.'" Ibid. (quoting Rode, supra, 892 F.2d at 1183 (internal citation and quotation marks omitted)).
Once the lodestar is determined, the judge "should consider whether to increase that [amount] to reflect the risk of nonpayment in all cases in which the [prevailing] attorney's compensation entirely or substantially is contingent on a successful outcome." Id. at 337, 661 A.2d 1202.
If the judge follows those steps, an appellate court should disturb the fee "only on the rarest occasions, and then only because of a clear abuse of discretion." Id. at 317, 661 A.2d 1202; accord Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 443-44, 771 A.2d 1194 (2001). A trial court decision will constitute an abuse of discretion where "the `decision [was] made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" United States v. Scurry, 193 N.J. 492, 504, 940 A.2d 1164 (2008) (alteration in original) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571, 796 A.2d 182 (2002)).

A.
With these principles in mind, we examine defendants' argument that plaintiff was not entitled to any counsel fees from them because the retainer agreement he signed with his attorneys contained a settlement-veto provision. They urge such a provision violated R.P.C. 1.2(a), which provides, "A lawyer shall abide by a client's decision whether to settle a matter." They claim that plaintiff's counsel should not be allowed to profit from actions that were contrary to public policy and unenforceable.
The retainer agreement at issue provides:
Because we are taking a substantial risk in this litigation and waiving our customary retainer and recognizing that sometimes counsel fees may exceed the value of the case to the litigant, you agree not to accept any settlement figure which would not adequately compensate the Law Firm for the time we have put into the case. In other words, any settlement accepted by you must be approved by the Law Firm as well.
There were very few settlement offers. Plaintiff certified that he was presented with only one $80,000 pretrial settlement offer from defendants, which he "immediately rejected."[11] Defendants' counsel, *1093 on the other hand, certified that they subsequently made a $200,000 offer two months prior to trial, which was rejected by plaintiff's counsel, who demanded "well over" $1 million and did not consult with plaintiff.
In his written opinion, the judge addressed this issue as follows:
Defendants take[ ] the position that [the] retainer agreement is void mandating a denial of the fee application. They cite ... extensive case law standing for the proposition that it is the client and not the attorney who makes the decision as to whether to settle or not. It may well be that the retainer agreement is unenforceable as written, but this should have no effect on ... plaintiff's application for an award of attorney's fees and costs.... [P]laintiff has a statutory right to seek counsel fees and costs from... defendants pursuant to [N.J.S.A.] 10:5-27, and a counsel fee award in a fee[-]shifting case belongs to the plaintiff and not to the plaintiff's attorney. The Supreme Court of New Jersey has determined that counsel fees to be awarded to a party are determined independently of the rules of fee agreement. Szczepanski v. Newcomb [Med. Ctr.], Inc., 141 N.J. 346 [661 A.2d 1232] (1995).
... Plaintiff demanded $1 million to settle all the issues in the case. Defendants responded with an offer of $80,000. The offer by the defendants was insignificant in this particular case, and I find was not a good faith offer under the circumstances. Plaintiff certainly could not be expected to bid against such a paltry offer given the extent of plaintiff's loss and legal fees, and not even considering punitive damages.
Defendants rely on Heher v. Smith, Stratton, Wise, Heher & Brennan, 170 N.J. 213, 785 A.2d 907 (2001), and Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 34-35, 607 A.2d 142 (1992), to support their position that plaintiff was not entitled to any award of counsel fees in light of the offending language in the retainer agreement. In Heher, our Supreme Court stated that the defendant was "not permitted to have `the benefits of a covenant that is against public policy and unenforceable.'" Heher, supra, 170 N.J. at 221, 785 A.2d 907 (quoting Jacob, supra, 128 N.J. at 35, 607 A.2d 142). However, that action was a partnership-agreement dispute arising from the plaintiff's withdrawal from the firm and the effect to be given a restrictive-covenant provision, id. at 216, 785 A.2d 907, not a LAD case involving a dispute over fees. Jacob, too, involved a law firm's partnership agreement containing a restrictive covenant. Jacob, supra, 128 N.J. at 14, 607 A.2d 142. We do not find either case instructive here, although we certainly do not disagree with the general proposition that public policy may trump contractual provisions.
The issue here is whether defendants may assert the public policy embodied in R.P.C. 1.2(a) to avoid their own statutory obligation to pay attorneys' fees to plaintiff. The Court in Szczepanski made it clear that "the reasonable counsel fee payable to the prevailing party under fee-shifting statutes is determined independently of the provisions of the fee agreement between that party and his or her counsel." Szczepanski, supra, 141 N.J. at 358, 661 A.2d 1232. Thus, an unenforceable provision in the retainer agreement does not prevent the award of counsel fees pursuant to N.J.S.A. 10:5-27.1 and does not control the fee award that a judge may grant in his or her discretion. *1094 Id. at 358-59, 661 A.2d 1232. We thus reject defendants' argument that the settlement-veto provision in the retainer agreement required denial of plaintiff's application for counsel fees.

B.
We next consider defendants' argument that the lodestar was excessive because it included hours plaintiff's counsel spent litigating unsuccessful motions and claims wholly distinct from the grounds on which plaintiff prevailed, specifically: (1) plaintiff's unsuccessful motion to disqualify defendants' counsel, which cost $21,537.50, and (2) plaintiff's dismissed gender-discrimination claim, a claim for which counsel never specified the actual time spent.
In calculating the lodestar, our Supreme Court has directed judges to exclude hours that (1) are "excessive, redundant, or otherwise unnecessary," or (2) were spent litigating claims "that were distinct in all respects from claims on which the party did succeed." Rendine, supra, 141 N.J. at 335, 661 A.2d 1202 (citations and internal quotation marks omitted). "`[N]o compensation is due for nonproductive time.'" Ibid. (quoting Copeland v. Marshall, 641 F.2d 880, 891 (D.C.Cir.1980)).
Here, the judge found that the hourly rates presented in plaintiff's fee application were appropriate. He then reduced the aggregate hours by the time counsel spent conferencing in the office, nonproductive time. He found that, overall, "defendants' unwillingness to provide the necessary discovery in this case" caused many of the problems in the case, which obviously increased plaintiff's counsel fees, and that no reduction was appropriate in this respect. As to the gender discrimination claim, the judge found that "the predicate facts for age and gender discrimination are virtually identical" and thus not subject to exclusion under Rendine, supra, 141 N.J. at 335, 661 A.2d 1202, for time spent litigating distinct claims. Finally, he also rejected defendants' claim that time spent on unsuccessful motions should be excluded.
We find no abuse of discretion in the judge's determination that the lodestar should not be reduced for any time spent on plaintiff's gender discrimination claim. In the context of a claim for attorneys' fees in an action under 42 U.S.C.A. § 1988, our Supreme Court in Singer v. State, 95 N.J. 487, 489-90, 472 A.2d 138, cert. denied, 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 64 (1984), has observed that "if a plaintiff's unsuccessful claims are related to the successful claims, either by a `common core of facts' or `related legal theories,' the court must consider the significance of the overall relief obtained to determine whether those hours devoted to the unsuccessful claims should be compensated." Id. at 500, 472 A.2d 138 (citation omitted); see also Kluczyk v. Tropicana Prods. Inc., 368 N.J.Super. 479, 498-500, 847 A.2d 23 (App. Div.2004) (refusing to reduce counsel fees where the plaintiff prevailed on his retaliatory discharge claim but not on his sexual harassment claim due to the overlapping evidence of the claims). We agree with the trial judge that there should be no reduction for time spent litigating the gender discrimination.
However, we come to a different conclusion with respect to the time spent by plaintiff's counsel in moving to disqualify defendants' attorney. That was not productive time as it did not in any way advance plaintiff's cause. See Rendine, supra, 141 N.J. at 335, 661 A.2d 1202. As such, the lodestar must be reduced by $21,537.50 to $822,100.50.

C.
Last, defendants argue that the twenty-five-percent fee enhancement of $210,909 *1095 must be vacated or reduced. First, they urge that the judge mistakenly concluded that an enhancement must be awarded in every case. Second, plaintiff's counsel had mitigated all risks of nonpayment since the retainer agreement included the settlement-veto provision and also gave counsel one-third of the total damages award, making the fee enhancement inappropriate on the facts submitted to the judge.
The retainer agreement provided:
(4) If your case is won or settled, our fee will consist of the higher of the two following figures:
a. 33-1/3% ... of the total combined recovery of damages, including statutory attorney's fees. This is in addition to the $5,000 paid.
b. Compensation for all time expended at our full hourly rate of $375.00 at the time of final settlement or verdict, plus an enhancement of 100% to compensate us for the risk we are taking. (This applies where defendant pays the fee.)
In deciding the issue before us, we are cognizant of the recent decision by the United States Supreme Court in Perdue v. Kenny A., ___ U.S. ___, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010), concerning fee enhancements under federal fee-shifting statutes. There, the Court reaffirmed earlier decisions that fee enhancements are only
permitted in extraordinary circumstances.... [T]here is a strong presumption that the lodestar is sufficient; factors subsumed in the lodestar calculation cannot be used as a ground for increasing an award above the lodestar; and a party seeking fees has the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified.
[Id. at ___, 130 S.Ct. at 1669, 176 L.Ed.2d at 501-02.]
However, Rendine, supra, 141 N.J. at 333-45, 661 A.2d 1202, governs our determination of the issue before us because the New Jersey Supreme Court "wr[o]te on a relatively clean slate in addressing the issue of contingency enhancement of lodestar fees under the LAD." Id. at 333, 661 A.2d 1202 ("Although we often have incorporated the reasoning of federal cases construing analogous federal statutes in our interpretation of the LAD, we have not been reluctant to depart from federal precedent when we determined it to be inappropriate." (citation omitted)). The Court observed,
Our review of the extraordinary volume of federal litigation on the question of contingency enhancements in determining a reasonable fee under federal fee-shifting statutes demonstrates the need for a clear rule, one that can readily and definitively be applied by trial courts, a rule that will end, not perpetuate, litigation of the issue.
[Id. at 334, 661 A.2d 1202.]
Thus, we are not bound by Perdue.
In LAD cases, trial courts should consider the risk of nonpayment in all contingent-fee cases when calculating a fee enhancement. Id. at 337, 661 A.2d 1202. Specifically, a trial court should take into account: whether the attorney took the case on a contingency basis; whether the attorney was able to mitigate the actual risk of nonpayment in any way; whether other economic risks were aggravated by the contingency of payment; whether the plaintiff was likely to succeed on the merits; and whether the legal risk associated with taking the case served as an economic disincentive, independent of that created by the contingent nature of the fee arrangement. Id. at 338-41, 661 A.2d 1202; see also Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 23, 860 A.2d *1096 435 (2004) (observing that a court should "consider the result achieved, the risks involved, and the relative likelihood of success in the undertaking" (citation omitted)). Additionally, where the "likelihood of success is unusually strong, a court may properly consider the inherent strength of the prevailing party's claim in determining the amount of the contingency enhancement." Rendine, supra, 141 N.J. at 341, 661 A.2d 1202 (citation omitted).
After noting that contingency enhancements that double the lodestar represented "the high end of attorney fee awards under fee-shifting statutes," id. at 342, 661 A.2d 1202, the Court "conclude[d] that contingency enhancements in fee-shifting cases ordinarily should range between five and fifty-percent of the lodestar fee, with the enhancement in typical contingency cases ranging between twenty and thirty-five percent of the lodestar." Id. at 343, 661 A.2d 1202.
In his written decision, the judge said that "plaintiffs in contingency cases are presumptively entitled to a contingency enhancement." That conclusion was incorrect. The Rendine Court only held that courts should consider the issue of whether a fee enhancement was appropriate. Id. at 337, 661 A.2d 1202. The Court did not mandate fee enhancements in every LAD contingency case. Gallo v. Salesian Soc'y, Inc., 290 N.J.Super. 616, 660, 676 A.2d 580 (App.Div.1996) ("Nowhere does the [Rendine] Court say that a fee enhancement multiplier must be awarded in every case."). Thus, the judge erred by concluding that an enhancement must be awarded in every contingency fee lawsuit.
After erring in this fashion, the judge then considered the following factors:
It should be noted that the award by the jury in this matter was substantial and took into consideration almost every loss alleged by ... plaintiff. Certainly there were risks inherent with the trial of this case. However, if the defense had prevailed on their after-acquired evidence defense or failure to mitigate, the plaintiff's compensatory damages would have been substantially reduced. The Court should also consider whether the result achieved is significant and of public interest. Proving age discrimination by a major corporation is certainly significant. The issue of age discrimination or the factual issues which drove this case were not unique[,] and the law was largely settled. Based on that analysis, the Court finds that a 25% enhancement of the lodestar fee is appropriate.
These findings, too, lost sight of the issue to be resolved in this case. Was a fee enhancement appropriate in this case in light of the fee provided by the retainer agreement? We do not doubt that the economic risks of taking the case were aggravated by the contingency of payment and by the agreement's requirement that plaintiff, who was already in great debt as a result of his termination, had to pay all litigation costs even if he lost. In fact, the risk was very high that plaintiff would not have been able to pay the litigation costs, given the size of the record, the length of discovery and trial, and plaintiff's other debts. In DePalma v. Building Inspection Underwriters, 350 N.J.Super. 195, 220, 794 A.2d 848 (App.Div.2002), we explained that "the risk of losing constitutes an economic disincentive to representing plaintiffs on a contingent basis in employment-related cases, and employees who lose their jobs generally cannot afford representation on any other basis." We also recognize that, since plaintiff had not been a very highly paid employee, counsel could not have anticipated a large award when *1097 they agreed to represent plaintiff. Thus, there was a risk of nonpayment given the nature of plaintiff's claim and the low likelihood of reimbursement for costs incurred. These considerations may be compelling where an attorney may be unable to mitigate his or her risk. Rendine, supra, 141 N.J. at 340, 661 A.2d 1202.
Nevertheless, counsel here provided for their own "fee enhancement" by obtaining plaintiff's agreement to a contingency fee of one-third of any recovery obtained by plaintiff or a fee enhancement of one-hundred percent, whichever was higher. In this case, the lodestar, all compensatory damages, prejudgment interest, and punitive damages as modified by this opinion, equal $4,123,378.87 of which counsel are entitled to either one-third, or $1,374,459.62, rather than merely the amount of the lodestar or the lodestar doubled. This yields a fee-enhancement of at least $552,359.12 in excess of the lodestar, an amount equivalent to sixty-seven percent of the lodestar, or double the lodestar. In such a case, an additional fee enhancement was inappropriate and should not have been awarded at all. We express no opinion respecting the enforceability of the fee enhancement provided in the retainer agreement.
[At the direction of the court and for the sake of brevity, Section VI has been omitted from the published version of the opinion.]
Affirmed in part, modified in part, reversed in part, and remanded for entry of a judgment in conformity with our decision.
NOTES
[1] Gruhin received Individual Performance Factor (IPF) scores of 110 in March 2001 and 110 in September 2001, which placed him in the "effective" range. Scores could range from zero to 200 with 100 as average.
[2] Glenn's IPF was 125 in March 2001, 135 in September 2001, and 120 in March 2002, highly effective scores. In September 2002, Werner gave Glenn an IPF of 70.
[3] Cook had routinely received good evaluations over the years.
[4] BMW of N. Am. Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).
[5] Baker v. Nat'l State Bank, 161 N.J. 220, 736 A.2d 462 (1999).
[6] There is no claim here that our PDA does not provide sufficient fair notice of the conduct that will subject an actor to punitive damages or the severity of the penalty that may be imposed.
[7] The PDA provides that courts shall consider all evidence relevant to the factors set forth in N.J.S.A. 2A:15-5.12(b) as well as the profitability of the misconduct, when it was terminated, and the financial condition of the defendant. N.J.S.A. 2A:15-5.12(c).
[8] Defendants urge that the jury could not consider the impact of its actions on other older workers; however, the jury was free to consider that impact on the issue of reprehensibility. Philip Morris U.S.A. v. Williams, 549 U.S. 346, 355, 127 S.Ct. 1057, 1064, 166 L.Ed.2d 940, 949 (2007) ("Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible[.]").
[9] The Court also recognized that a higher ratio may be appropriate where compensatory damages are small, id. at 425, 123 S.Ct. at 1524, 155 L.Ed.2d at 606, but that is not the case here.
[10] Although Lockley v. New Jersey Department of Corrections, 177 N.J. 413, 828 A.2d 869 (2003), was decided four months after Campbell, it did not have occasion to consider Campbell's impact on our PDA and LAD cases. Neither have we found any reported New Jersey case that has done so. This is also true of Third Circuit and District of New Jersey reported decisions.
[11] He also rejected an offer made by defendants after the jury returned its verdict on compensatory damages, but before any punitive damages verdict. We do not consider this offer as having any bearing on this issue because, as a prevailing party, plaintiff had an accrued right to an award of statutory counsel fees.