**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4970-16T1

FRED BONDA,

       Plaintiff-Respondent/
       Cross-Appellant,

v.

CITY OF ELIZABETH,

       Defendants-Appellant/
       Cross-Respondent,

and

ELIZABETH FIRE DEPARTMENT,

       Defendant,

v.

CHRISTIAN BOLLWAGE, individually and in his official capacity, EDWARD SISK, individually and in his official capacity, and MARK CHAI, individually and in his official capacity,

       Defendants,

v.

ONOFRIO VITULLO, individually and in his official capacity, and THOMAS McNAMARA, individually and in his official capacity,

Defendants-Respondents.

_____

Argued March 26, 2019 – Decided June 21, 2019

Before Judges Yannotti, Gilson, and Natali.

On appeal from Superior Court of New Jersey, Law Division, Union County, Docket No. L-1979-13.

Robert F. Varady argued the cause for appellant/cross-respondent (La Corte Bundy Varady & Kinsella, attorneys; Robert F. Varady and Christina Marie DiPalo, on the briefs).

Paula Marcy Dillon argued the cause for respondent/cross-appellant (Krumholz Dillon, PA, attorneys; Alan L. Krumholz and Paula Marcy Dillon, on the brief).

Catherine M. DeAppolonio argued the cause for respondent Onofrio Vitullo (Renaud DeAppolonio LLC, attorneys; Catherine M. DeAppolonio, on the brief).

Raymond S. Londa argued the cause for respondent Thomas McNamara (Londa & Londa, attorneys; Raymond S. Londa, on the brief).

PER CURIAM

A-4970-16T1

Defendant the City of Elizabeth (the City) appeals from a series of orders embodying a January 27, 2017 jury verdict awarding plaintiff compensatory damages, and a March 27, 2017 jury verdict awarding punitive damages.[1]  The City also appeals from a March 24, 2017 order denying a motion for a new trial; a June 2, 2017 order denying the City's motion to vacate or remit the punitive damages award; and June 2 and June 28, 2017 orders awarding attorneys' fees to plaintiff's counsel.

Plaintiff, Fred Bonda, filed a "protective" cross-appeal from a September 16, 2016 order granting summary judgment to defendant Onofrio Vitullo; a February 14, 2017 order dismissing the claims against defendant Thomas McNamara; and a March 24, 2017 order denying plaintiff's motion for reconsideration.  Having reviewed the arguments in light of the record and applicable law, we affirm the orders against the City.  Accordingly, we do not reach the issues raised in plaintiff's protective cross-appeal.

---

[1]  We note that the record on appeal did not include the final judgment memorializing the jury verdicts.  Nonetheless, the verdicts were embodied in the court's orders regarding attorneys' fees dated June 2 and June 28, 2017, both of which explain that the court "recognized" the jury verdicts as to compensatory and punitive damages.

I.

We take the facts from the record, including the testimony and evidence presented at trial. Because of the issues raised on this appeal, we set forth the evidence in detail.

Plaintiff is a former employee of the City of Elizabeth Fire Department (the Fire Department). In 1995, he was hired as a firefighter. Three years later, he was promoted to the position of fire inspector. Subsequently, the fire inspector position was retitled, and plaintiff became a fire prevention specialist. He continued as a fire prevention specialist until early 2014, when he retired.

A.   Pre-Trial Proceedings

On May 30, 2013, plaintiff filed a complaint against the City, the Fire Department, City Mayor Christian Bollwage, Fire Director Onofrio Vitullo, retired Fire Chief Edward Sisk, Fire Chief Thomas McNamara, and retired Fire Official Mark Chai. In his complaint, plaintiff alleged violations of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, and the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. Plaintiff sued the individual defendants both individually and in their official capacities as his supervisors at the Fire Department.

A-4970-16T1

After the close of discovery, defendants moved for summary judgment. On September 16, 2016, the court heard oral argument and granted summary judgment to defendants Bollwage, Sisk, Chai, and Vitullo. The court denied summary judgment as to the City, the Fire Department, and McNamara. With regard to McNamara, the court found there was a "question of material fact as to whether plaintiff's not being promoted was an act of retaliation by defendant McNamara" for plaintiff's whistleblowing activities. Thus, McNamara was the only individual defendant who remained in the case with the City and the Fire Department.

In its summary judgment decision, the court also dismissed plaintiff's LAD claims, finding they were "identical causes of action" to the CEPA claim, and thus, were excluded by CEPA's waiver provision, N.J.S.A. 34:19-8. The court further concluded that plaintiff had presented insufficient evidence to support a hostile-work-environment theory under CEPA. Finally, the court limited plaintiff's claims of retaliatory actions to events that occurred on or after May 30, 2012, finding that any earlier retaliatory conduct was barred by CEPA's one-year statute of limitations.

Thereafter, plaintiff filed a motion for leave to appeal the court's summary judgment rulings. We denied that motion.

B.    <u>Jury Trial on Liability and Compensatory Damages</u>

In January 2017, the court conducted a ten-day jury trial. During his case-in-chief, plaintiff testified and presented testimony from two experts: Dr. Sheryl Thailer, plaintiff's treating psychologist, and Kristin Kucsma, M.A., a forensic economist. Defendants collectively presented testimony from McNamara, Vitullo, Firefighter Patrick Byrnes, retired Fire Official Christian Lysy, Firefighter Edward Sisk, IV, Deputy Fire Chief Andrew Sandoukas, Battalion Chief Michael Mateiro, Deputy Fire Chief Daniel Campbell, and attorney Peter Spaeth.

At trial, consistent with the court's summary judgment ruling, plaintiff was limited to presenting evidence of retaliatory conduct that had occurred on or after May 30, 2012. Plaintiff's testimony set forth two categories of whistleblowing conduct underlying his CEPA claim: (1) objecting to McNamara's alleged attempts to force plaintiff to falsify roll call documents in June 2012; and (2) reporting that his superiors were improperly interfering with fire code violations.

Plaintiff testified that he was retaliated against by not receiving a promotion to fire official, being denied overtime pay, losing his honor guard privileges, being placed on-call for two weeks, being denied permission to

attend training courses, being deprived of personal property from his work vehicle, and being instructed not to issue any fire code violations. Defendants largely denied plaintiff's claims that unlawful conduct had occurred at the Fire Department and that plaintiff had been retaliated against for reporting such conduct.

1. Roll Call Incidents

With regard to the roll call incidents, plaintiff testified that on June 6, 2012, he was serving as acting fire official due to the fire official's absence. Part of his duties as acting fire official included verifying and signing the daily roll call, which he was asked to do that afternoon by McNamara. Plaintiff noticed that the roll call documented that retired Fire Chief Sisk's son, Edward J. Sisk, IV, had worked from 7 a.m. to 5 p.m. that day. Because neither plaintiff nor anyone else had seen Edward that day, plaintiff intended to mark him as "AWOL," but was "forced immediately by Chief McNamara" to sign the document as it was presented to him.

Plaintiff testified that he signed the roll call, but made a notation on the document: "Did not see him at all that day and no one else in the office saw him either." He then followed up with a letter to McNamara stating that he believed he was committing fraud.

On June 12, 2012, plaintiff was asked again to sign a roll call documenting that Edward had worked a shift, although neither plaintiff nor anyone else had seen him. According to plaintiff, when McNamara tried to "force" him to sign the roll call, plaintiff refused, stating that he believed it was a crime and that he "would not cover for anybody."

Plaintiff then testified that because he refused to sign the roll call, McNamara "threatened that he was going to take action against" plaintiff. Plaintiff further testified that he was never again asked to sign roll call as an acting fire official. He also testified that immediately after the June 12 incident, McNamara refused to pay him all of his overtime, put him on-call for two weeks straight without payment, denied all of his requests to attend training courses, denied him any paid jobs through the City, and called him a thief for taking prior paid jobs.

Edward Sisk, IV, also testified regarding the roll call incidents. He testified that on June 6, 2012, he was on light duty and "was probably downtown training with the recruits." At that time, plaintiff was his supervisor, yet Edward testified that he did not inform plaintiff that he would be training the recruits and not attending roll call. Edward further testified that on June 12, 2012, he

8

was off work and did not attend roll call. He explained that instead of contacting plaintiff to request that day off, he had called the on-duty deputy chief.

McNamara testified that he had no recollection of forcing plaintiff to sign a roll call and did not recall plaintiff informing him that he believed signing the sheet would be a crime. McNamara also testified that he did not recall threatening to take action against plaintiff if he refused to sign the roll call.

As to the alleged retaliatory conduct, McNamara testified that he never refused to pay plaintiff overtime, put him on-call for two weeks straight without pay, called him a thief, or denied him paid jobs. McNamara was unsure if he had ever denied plaintiff's requests to attend training courses, but noted that normally he was not involved in granting or denying such requests. Instead, the administrative deputy chief typically handled those requests, and McNamara could not recall if the administrative deputy chief had informed him that he had denied plaintiff's requests.

Firefighter Patrick Byrnes testified that he served as Union President of the Firefighters' Mutual Benevolent Association, Local 9, from 2003 to 2014. In his role as Union President, Byrnes handled grievances on behalf of union members. In 2012 and 2013, plaintiff, a union member, approached Byrnes with a number of potential grievances. At that time, plaintiff also reported that he

felt Fire Department employees were discriminating against and harassing him. Byrnes testified that he investigated plaintiff's reports of harassment and discrimination and "found no wrong doing on anybody's behalf." Nonetheless, Byrnes arranged a meeting between plaintiff and the attorneys who represented the union to discuss plaintiff's reports of harassment and discrimination. Plaintiff attended the meeting; however, no formal grievance was ever filed on plaintiff's behalf concerning allegations of discrimination and harassment.

Byrnes also testified that plaintiff approached him with complaints concerning unpaid overtime and requests to attend training courses. Regarding overtime, Byrnes testified that he asked plaintiff to provide a written list of the specific dates and times for which he was seeking to be compensated, which plaintiff provided. Byrnes submitted plaintiff's written list to the administration, the administration compensated plaintiff, and Byrnes confirmed with plaintiff that he had received the payment. Thereafter, plaintiff notified Byrnes that he had additional overtime hours to submit. Byrnes requested that plaintiff provide the additional dates in writing. Plaintiff never provided Byrnes with the list of additional dates.

Regarding plaintiff's requests to attend training courses, Byrnes testified that in October 2013, plaintiff reported he was being denied the right to attend

10

state-mandated courses. Byrnes alerted the administration to plaintiff's complaint and requested that plaintiff be permitted to attend trainings. The administration informed Byrnes that they would try to accommodate plaintiff's requests, but that there was "always a scheduling problem with sending people to school."

2.    Improper Interference with Fire Code Violations

In addition to the roll call incidents, plaintiff testified that throughout 2012 and 2013, his superiors at the Fire Department improperly interfered with violations of the fire code, either by wrongfully ignoring dangerous violations or by actively attempting to eliminate violations issued without remedying the basis of the violation. In that regard, plaintiff testified about nine different buildings where he found fire code violations and, according to plaintiff, those violations were either improperly handled or ignored. Plaintiff also testified that he made numerous complaints and he was subject to various forms of retaliation.

Plaintiff first testified concerning Oakwood Plaza, a site with five buildings, two of which had been undergoing renovations in 2012 and 2013. At some point in 2012, plaintiff witnessed individuals cutting all the fire protection devices from the buildings under renovation. Plaintiff testified that he notified McNamara, and McNamara told him to "stay away," that Oakwood Plaza was

A-4970-16T1

"none of [plaintiff's] business," and that plaintiff should not go there until he was told to go there. In contrast, McNamara testified that he never discussed nor was otherwise notified of plaintiff's concerns about Oakwood Plaza.

Plaintiff also testified that around June 2012, he conducted an inspection of Manolo's Restaurant and found unsafe electrical wiring near the stovetop exhaust hood. Plaintiff issued violations, but to his knowledge, they were never abated.

Later that month, City Councilman Grova called plaintiff and asked to meet with him. According to plaintiff, at the meeting, he told Grova about the roll call sheets, the fire code violations at Trinitas Hospital, Oakwood Plaza, Burry Biscuits, and Manolo's Restaurant, and the fact that a firefighter was given the rank of fire official when plaintiff believed that the job of fire official should go to a fire prevention specialist.

Several days later, plaintiff met with Mayor Bollwage at the mayor's office in Elizabeth City Hall. Plaintiff testified that the main reason the Mayor called the meeting was to see if plaintiff would clear the violations at Manolo's, which plaintiff refused to do.

After his meeting with the Mayor, plaintiff testified that McNamara told him that he "could not tolerate [plaintiff's] actions," that plaintiff was "not a

team player," that he was "supposed to do whatever [McNamara] says whether right or wrong," and that plaintiff was "nothing but a piece of shit spic." Plaintiff also testified that McNamara said that "what he says is the law, there is no other law." According to plaintiff, McNamara said plaintiff "would never get to fire official position because [plaintiff is] a piece of shit spic." Plaintiff also testified that at some point in 2012, McNamara was in the restroom with then-Fire Chief Sisk and Vitullo and told them "[o]h, that piece of shit spic will never get that position[.]"

McNamara testified that he "had nothing to do with" Manolo's and that he had "never talked to [plaintiff] about Manolo's." He further testified that he had only ever discussed Manolo's with the fire official. McNamara went on to testify that he was unaware plaintiff had been called to meetings with Councilman Grova and Mayor Bollwage, and he denied making any of the statements plaintiff alleged that he had made after plaintiff's meeting with the Mayor, including telling plaintiff that he would never become fire official.

On July 10, 2012, plaintiff wrote a letter to Vitullo. The letter was not admitted into evidence, but plaintiff testified that he wrote the letter because of McNamara's threatening behavior and explained that the letter also discussed plaintiff's meeting with the Mayor. At trial, Vitullo acknowledged he had

received the July 10, 2012 letter from plaintiff and stated that he had not responded to the letter. In addition, McNamara testified that he was never shown that letter before trial.

Plaintiff next testified that in July 2012, he inspected the Burry Biscuits building and observed that all the fire protection devices on site were completely out of service, despite the building being in use. Plaintiff also testified that later that fall, he was called to respond to a fire at Burry Biscuits. Plaintiff notified the incident commander that the building was occupied, and was then ordered to evacuate the building. According to plaintiff, both Provisional Fire Official Steven Zatko and McNamara told plaintiff to leave the site.

McNamara denied telling plaintiff to leave the Burry Biscuits site. Instead, McNamara testified that he did not discuss the Burry Biscuits building with plaintiff. He further testified that Zatko had not informed him of any issues plaintiff had observed at that building.

In August 2012, a large fire occurred in the basement of the Albender Building, which was used by Union County as office space. Plaintiff testified that he was not involved in the initial response, but that McNamara and Zatko responded and authorized the occupancy of the building after the fire.

Plaintiff testified that a few days later, as acting fire official, he drove by the site and witnessed a large generator leaking diesel fuel on the sidewalk with electrical wires running into the building. He also saw approximately fifty people outside the building trying to enter it. Plaintiff entered the building, which was "pitch black," and spoke to Sheriff's officers, who were using handheld metal detectors to scan the people entering the building. He checked the fire panel and the elevators and concluded that there was no electricity or running water in the building.

Plaintiff then instructed the Sheriff's officers to evacuate the building, which they did, and the county manager and a judge responded to the scene and agreed that the building was unsafe. Plaintiff testified that he also notified the Mayor, the electrical inspector, the health inspector, the housing inspector, and the construction official and asked if they believed the building should be occupied.

According to plaintiff, McNamara subsequently "berated" him and asked why he closed down the building when McNamara had authorized its occupancy. Plaintiff asked for written authorization from McNamara for people to occupy the building, and McNamara leaned in approximately six inches from plaintiff's

15

face and responded: "I'm going to f'ing poke your eyes out." Plaintiff testified that two days later, the generator outside the Albender Building caught fire.

On August 9, 2012, plaintiff wrote a letter to Chief Kilmer, the State Fire Marshal, concerning, among other things, the Albender Building incident. Plaintiff testified that, as a result of this letter, Chief Kilmer sent an inspector from the state, but plaintiff was not aware of the outcome of that investigation.

McNamara acknowledged that a fire had occurred at the Albender Building, however, he denied that he had authorized occupancy of the building. Instead, McNamara testified that authorizing occupancy of a building was outside his jurisdiction. McNamara further testified that he did not reprimand plaintiff for evacuating the Albender Building. He went on to testify that the fire official had never informed him plaintiff had observed any issues with the Albender Building.

Regarding the letters plaintiff allegedly sent to Chief Kilmer, McNamara testified that he neither received copies of those letters nor spoke with Chief Kilmer. McNamara acknowledged that a state inspector had visited the Fire Department; however, McNamara testified that he did not meet with the inspector. McNamara further testified that he did not discuss the purpose of the inspector's visit with any other members of the Fire Department.

16

Later that month, plaintiff went on medical leave as advised by his psychologist, Dr. Thailer, due to anxiety, high blood pressure, chest pains, and fear for his safety. Plaintiff testified that while on leave, he was ordered by Deputy Fire Chief Campbell not to leave his home unless he first notified the Fire Department. McNamara disputed plaintiff's testimony, explaining that while plaintiff was on medical leave, McNamara had not restricted him from leaving his house nor did he instruct Campbell to do so.

Before his medical leave, plaintiff was in possession of a city vehicle, which he parked in front of his home. The vehicle contained plaintiff's personal property, including emergency medical technician equipment. While plaintiff was on medical leave, the vehicle was taken. According to plaintiff, when he reclaimed it from the Fire Department, his personal property and his log books containing his pay jobs and hours worked were missing.

McNamara testified that he did not order a search of the city vehicle assigned to plaintiff. He further testified that he did not authorize anyone to remove personal property from that vehicle.

Former Union President Byrnes testified that plaintiff had informed him that items were stolen from his city vehicle. In response, Byrnes advised

plaintiff to file a police report, however, Byrnes did not know if plaintiff filed a report.

Plaintiff testified that when he returned from his medical leave in February 2013, he discovered that his computer files had been tampered with and fire code violations he had written were either cleared or marked as abated. Plaintiff also testified that McNamara "would not recognize [him] in any way, shape or form" and that McNamara would say only derogatory things about plaintiff and showed contempt towards him. Plaintiff claimed that his interactions with McNamara "progressively got worse and worse" and became "unbearable." McNamara denied these allegations and maintained that he treated plaintiff professionally throughout his time with the Fire Department.

On March 4, 2013, plaintiff wrote a letter to then-Provisional Fire Official Lysy describing the "scanning" and alteration of his computer files, including the falsification of an inspection report for Trinitas Hospital that appeared to be completed by plaintiff during his medical leave. Plaintiff testified that he wrote: "I believe my files are being manipulated and falsified please advise immediately how the [Fire Department] is going to address the situation." Lysy never responded to the letter.

On March 29, 2013, plaintiff wrote a second letter to Chief Kilmer. Plaintiff testified that the purpose of the letter was to inform Kilmer of the violations he believed were being improperly dealt with, and to describe the retaliation plaintiff was facing as a result of speaking out about the violations.

Before writing the letter, plaintiff testified that he informed McNamara that he intended to write the letter, and McNamara responded that he "was going to make [plaintiff's] life miserable if [plaintiff] proceeded to do anything as such, that . . . if he could, he would even fire [plaintiff], but he definitely was going to make [plaintiff's] life a living hell, which he did." Plaintiff testified that he did not tell anyone at the Fire Department that he sent the letter. McNamara denied making any of the alleged statements plaintiff attributed to him.

On May 30, 2013, plaintiff filed his complaint. He testified that while he filed the complaint because of his working conditions and because he was not being paid for all of his hours, he primarily did so because he was being told to disregard fire code violations by McNamara. Plaintiff testified that McNamara said "he did not want any violation that was creating any kind of wave," and that plaintiff's violations had been creating waves.

Plaintiff testified that immediately after filing his complaint, he was shunned by the officers of the Fire Department. He testified that McNamara

19

"kind of blew his top" and told plaintiff that he was not to issue any violations or penalties and was to obey Provisional Fire Official Lysy's directives. Despite this admonition, plaintiff continued to write violations because he had sworn an oath to do so, and he handed the violations to Lysy.

McNamara testified that neither before nor after the filing of plaintiff's complaint, did he ever instruct plaintiff not to issue violations. Indeed, he testified that he did not have the authority to make that demand of plaintiff.

Plaintiff testified that soon after filing his complaint, he began to see inspection files being altered in the system, including the elimination of his name from inspection reports and the clearing or abatement of violations. Plaintiff also testified that he gave his supervisors, including McNamara, written notice of what he was seeing in his files and requested that something be done about it, but received no response. According to plaintiff, McNamara at some point said something "to the effect, 'stick your letters up your,' you know[.]"

In June 2013, plaintiff conducted an inspection of a rooming house on William Street, which housed approximately thirty residents. He found that the building did not comply with the fire code because it lacked smoke detectors, fire extinguishers, exit lights, and secondary means of egress. Plaintiff testified that he reported these conditions to Lysy and McNamara and wrote up a notice

of violation, but the violations were never corrected. According to plaintiff, McNamara told plaintiff that the owner of the rooming house "had a relationship with the [M]ayor" and that plaintiff should stay away from the building. Subsequently, a fire occurred in the building in which a sixteen-year-old girl died. After the fire, McNamara told plaintiff to "keep [his] big f'ing mouth closed" and not to talk to anyone, "especially the media."

McNamara denied all of plaintiff's allegations related to the William Street rooming house. Specifically, McNamara testified that he never discussed the property on William Street with plaintiff, never told plaintiff to stay away from that property, and never told plaintiff that the owner of the property had a relationship with the Mayor. Lysy testified that there was a fire at the William Street property in 2013, however, he explained that he had never instructed plaintiff not to visit that property.

On June 6, 2013, a report appeared on plaintiff's computer regarding the Coelho Rooming House. According to plaintiff, the report showed that Lysy had issued seven violations and abated them the same day. Plaintiff testified that he was the fire prevention specialist assigned to inspect that rooming house, and that the inspection was attributed to him even though Lysy had performed it. Two to three days after seeing the report, plaintiff inspected the Coelho

21

Rooming House and found that the violations had not been resolved. Plaintiff testified that not only did the record show that the violations were abated, but Lysy had issued a certificate of inspection, which certified that the building met the fire code. Plaintiff confronted Lysy about the report.

Lysy testified that he inspected the Coelho Rooming House on June 6, 2013, and observed seven violations. He then re-inspected that property around June 26, 2013, and found that the violations had been abated. Thereafter, Lysy signed a certificate of inspection dated July 3, 2013.

On July 15, 2013, plaintiff inspected the China Moon restaurant and recorded several violations of the fire code. Plaintiff testified that these violations were altered in the computer system, and that they were marked "abated" by Lysy on the same day they were issued. Plaintiff went back to the restaurant to verify that the violations were not, in fact, abated, and discovered that they were not. Plaintiff explained that it would be impossible to abate the violations in a single day because the abatement of some violations would require a permit. A couple of days later, plaintiff confronted Lysy and asked him how it was possible that the record showed abatements, and asked him for the certification for the fire alarms. Plaintiff testified that, as of February 2014,

the Fire Department had not received the certification indicating that the violations were actually resolved.

Lysy denied altering any of the China Moon files. In contrast, he testified that the file indicated that plaintiff had inspected the China Moon property on July 15, 2013. He also testified that there was a second document stating that he had also inspected that same property on July 15, 2013, and found nine violations, which were thereafter abated on an unmarked date. Lysy testified that he did not inspect the China Moon property on July 15, 2013. Rather, both Lysy and Battalion Chief Mateiro testified that Lysy was on vacation that day.

On September 23, 2013, plaintiff wrote a letter to Mateiro notifying him that plaintiff's computer files were being "manipulated and changed" without his "knowledge and approval."

McNamara testified that he first learned that plaintiff believed his files were being scanned and manipulated when plaintiff sent a letter to Mateiro and a copy of that letter was sent to McNamara. McNamara testified that he did not have access to plaintiff's computer files, and had not scanned or manipulated any of plaintiff's files. Similarly, Deputy Fire Chief Andrew Sandoukas also testified that neither McNamara nor Vitullo had access to the fire inspection computer system, which held plaintiff's files.

23

McNamara and Deputy Fire Chief Campbell testified that Mateiro and Campbell investigated plaintiff's computer complaints. As to the claim that files were being scanned, Campbell concluded that an anti-virus program had been scanning plaintiff's computer. Regarding the claim that plaintiff's files were being manipulated, Campbell asked plaintiff if he could provide addresses for the properties whose files had been altered. Plaintiff allegedly informed Campbell he was unable to provide specific addresses until he discussed the matter with his attorney. Plaintiff never provided addresses to Campbell.

In 2013, plaintiff and Lysy each took a civil service examination for the position of fire official, and the results were published on July 24, 2013. Lysy was ranked number one, with a score of 73.6, and plaintiff was ranked number two, with a score of 71.8. Vitullo, as the person with the authority to make the fire official appointment, appointed Lysy to the position. Plaintiff testified that being first on the list does not entitle that person to the position, but that the Fire Department must follow the "rule of threes" and base its decision upon both qualifications and rankings. Plaintiff claimed that the correct procedure for selecting the fire official was for the chief of the department and the director to interview the candidates and review their qualifications and previous records. Plaintiff asserted that since he was the only fire prevention specialist on the

24

eligible list, the Fire Department ignored the requirements for the fire official position by appointing Lysy. He testified that he was denied the position in retaliation, and that McNamara had told him he would "never get the F-ing position of fire official."

McNamara testified he did not have the authority to appoint the fire official; rather, the director made that decision. McNamara further testified that he did not tell plaintiff he would never become fire official.

Vitullo testified that he had the authority to promote someone to the fire official position in accordance with the civil service requirements. He explained that he appointed Lysy because he had finished first on the civil service examination, and plaintiff had finished second. In addition to relying on the examination results, Vitullo explained that in deciding to promote Lysy he also considered Lysy's "gregarious" disposition. Vitullo went on to note that Lysy worked well with other people, was qualified for the position, and was "technically astute." Vitullo confirmed that neither plaintiff nor Lysy were interviewed for the position. On direct examination, Vitullo testified twice that McNamara did not participate in the decision to promote Lysy. Nonetheless, on cross-examination Vitullo testified that he had consulted with McNamara "as to who he thought might make the best candidate for fire official[.]"

25

On August 12, 2013, plaintiff wrote a letter to the city employee manager and director of the City's whistleblowing program, Anita Pritchard. Plaintiff testified that he wrote the letter to address an incident in which plaintiff asked then-Union President Byrnes, "why Steve Zatko was offered some kind of deal." This caused Byrnes to become irate and report the incident to McNamara, and McNamara threatened to fire plaintiff. Plaintiff also wrote to inform Pritchard of the retaliation, discrimination, and hostile work environment he believed he was experiencing.

According to plaintiff, Pritchard never responded, but McNamara called plaintiff into a meeting with Vitullo and Campbell the next day. At this meeting, plaintiff was told that he was no longer the fire inspector, he was being placed under house arrest, and was then escorted from the building without retrieving anything from his desk. The house arrest lasted approximately three weeks, and according to plaintiff, during that time, Fire Department vehicles appeared outside plaintiff's home to "check on" him. After the City hired an attorney to investigate the incident between plaintiff and Byrnes, and after the City performed a psychiatric examination on plaintiff, he was determined fit to return to work on September 18, 2013.

A-4970-16T1

McNamara testified he neither received a copy of plaintiff's letter to Pritchard nor communicated with Pritchard regarding plaintiff. Nonetheless, McNamara was aware of the confrontation between Byrnes and plaintiff, as he had received a letter written by Byrnes, wherein Byrnes reported that plaintiff had threatened him and he feared for his life. Byrnes's letter was sent to City Hall. Thereafter, McNamara testified that the City's law department advised that plaintiff should be placed on administrative leave with pay and escorted out of fire headquarters. The Fire Department complied with the law department's advice. According to McNamara, he, Vitullo, and Campbell met with plaintiff. At that meeting, plaintiff received a letter from McNamara explaining he was being placed on administrative leave with pay, then plaintiff was escorted from fire headquarters.

McNamara also testified that plaintiff was not placed on house arrest during his administrative leave and he denied that Fire Department employees were watching plaintiff while he was on leave. Moreover, Byrnes testified that plaintiff had reported to him that Fire Department employees were parked in a city vehicle outside his home and were watching him while he was on leave. Byrnes investigated the report by speaking with McNamara and by repeatedly

A-4970-16T1

driving past plaintiff's home. Byrnes testified that during the course of his investigation, he observed only plaintiff's vehicle in front of plaintiff's house.

Upon his return from administrative leave, plaintiff testified that McNamara instructed him not to issue penalties or violations without McNamara's approval. Plaintiff testified he was also instructed "not to talk directly to Chief McNamara, . . . not to talk directly to Director Vitullo, . . . not to talk directly to Chief Campbell, [and] not to have any access to fire headquarters without being escorted by a supervisor." Plaintiff further testified that September 2013 to January 2014 was "the worst time in [his] life," because McNamara orchestrated plaintiff's ostracization "throughout the entire department." McNamara denied plaintiff's allegations and testified that he continued to treat plaintiff as a colleague after he returned from administrative leave.

In September 2013, plaintiff noted that a demolition occurring at Trinitas Hospital was improper because all fire protection had been removed from the building. Early in 2012, plaintiff had conducted an inspection of Trinitas Hospital and observed "several individuals removing all the fire protection devices in the entire facility." After the 2012 inspection, plaintiff testified that McNamara told him to "stay away" from the Trinitas Hospital facility. While

28

driving by Trinitas Hospital in March 2013, plaintiff observed people removing the exterior and interior fire protection devices from another building in the Trinitas Hospital facility. Plaintiff informed then-Fire Official Lysy of these activities due to McNamara's prior admonition.

When plaintiff raised the issue with both McNamara and Lysy in September 2013, and asked them where the demolition permits were, McNamara allegedly told plaintiff that he was not to be involved with the Trinitas Hospital site. Plaintiff further testified that, at that time, McNamara was "taking all kinds of actions against me[.]"

McNamara testified he was notified that plaintiff had a concern as to the Trinitas Hospital site in 2012 when Mark Chai was fire official. McNamara further testified that he did not discuss the Trinitas Hospital site with plaintiff in 2012, nor did he ever instruct plaintiff to stay away from that site. McNamara further explained that plaintiff had never informed him that the Trinitas Hospital facility was being demolished without permits.

In November 2013, a truck dumped a load of garbage in front of plaintiff's front door. Plaintiff testified that after searching through the garbage, he found items indicating that the garbage was connected to the father of a fireman whose home was a few blocks away from plaintiff's home. Plaintiff also testified that

in November 2013, water spilled from a leaking pipe in the ceiling of the Fire Department and damaged everything on his desk. Plaintiff notified Mateiro, but did not receive a response. McNamara denied knowledge of the garbage that was allegedly dumped on plaintiff's lawn. McNamara further testified that he did not cause the leak over plaintiff's desk and he was not aware of any other person who had caused the leak.

Plaintiff testified that he decided to retire in January 2014, stopped working in February 2014, and officially retired at the end of May 2014. Plaintiff explained that he "did not deserve to retire" and wanted to continue working for ten more years until the age of sixty-five, but the retaliation prevented him from doing so.

3. Expert Testimony

Plaintiff also presented testimony from two experts who addressed plaintiff's damages. First, Dr. Sheryl Thailer testified to the emotional distress plaintiff suffered because of the retaliatory conduct he allegedly endured while at work. In that regard, she testified that she had diagnosed plaintiff with major depression and had determined that incidents at work were causally related to the depression. Dr. Thailer also testified that plaintiff suffered headaches,

crying spells, sadness, nightmares, and worsening of back pain due to the conduct of his coworkers.

Next, Kristin Kucsma, M.A., testified to the economic harm plaintiff allegedly suffered based on his early retirement. She explained that plaintiff had retired at age fifty-four, and, during his testimony, he claimed that he would not have retired at that age had it not been for the retaliatory conduct of his employer. Kucsma testified that had plaintiff continued working as a fire prevention specialist until age sixty-five, and paid taxes each year, he would have earned an additional $323,014. She also testified that had plaintiff been promoted to the fire official position in 2013, and continued working until age sixty-five, paying taxes each year, he would have earned an additional $723,913.

After Kucsma finished testifying, plaintiff rested. At that time, defendant McNamara moved pursuant to Rule 4:37-2(b) to dismiss plaintiff's case, contending there was no evidence that McNamara retaliated against plaintiff by failing to promote him to fire official. The court denied that motion.

4. Directed Verdict Motion

At the close of evidence, McNamara, the City, and the Fire Department moved for a directed verdict. McNamara again argued that he was not the appointing authority, and thus, could not have retaliated against plaintiff by

failing to promote him to the fire official position. The City argued that the promotional issue should not be in the case based on the court's earlier summary judgment ruling as to Vitullo, and because Vitullo had promoted the number one candidate from the civil service list. The court reserved decision as to the directed verdict motions.

The case was submitted to the jury on January 26, 2017, and on January 27, 2017, the jury returned a verdict finding McNamara, the Fire Department, and the City liable to plaintiff on his CEPA claim. The jury awarded plaintiff $750,000 in lost wages and $325,000 for emotional distress damages.

C.    Post-Trial Proceedings and Punitive Damages Trial

On February 13, 2017, the trial court issued a letter opinion granting a directed verdict to defendant McNamara. The decision stated that the jury's verdict against the City remained in place. Accordingly, on February 14, 2017, McNamara was dismissed from the case. Plaintiff filed a motion for reconsideration, which was denied.

After McNamara's dismissal, the City moved for a new trial and to dismiss plaintiff's punitive damages claim. The trial court denied both motions, and on March 27, 2017, a punitive damages trial against the City was conducted. The

jury awarded $1,000,000 in punitive damages. The City then filed a motion to vacate or remit the punitive damages award, which the trial court denied.

On June 2, 2017, the trial court awarded plaintiff $297,072.33 in counsel fees and costs, and on June 28, 2017, the court awarded plaintiff supplemental counsel fees of $11,070.40.

The City filed its notice of appeal on July 12, 2017. Thereafter, plaintiff filed a timely notice of a "protective" cross-appeal.

II.

We begin our analysis by reviewing the evidence presented at trial to evaluate whether it was sufficient to sustain the jury's verdict that the City violated CEPA. We start with this analysis because if there was sufficient evidence to support the jury's verdict, then most of the City's arguments fail. Moreover, plaintiff's cross-appeal becomes moot because plaintiff is only seeking to raise his arguments if the jury verdict is reversed or a new trial is ordered.

In analyzing whether there was sufficient evidence presented to support plaintiff's CEPA claim, we note that "[o]ur judicial framework accepts that there is a presumption of correctness in jury verdicts." Romano v. Galaxy Toyota, 399 N.J. Super. 470, 477 (App. Div. 2008) (citing Baxter v. Fairmont Food Co.,

74 N.J. 588, 598 (1977)). "In light of the fact that the jury's verdict . . . was for plaintiff, we 'view the facts in the light most favorable to [plaintiff]' . . . . and we recite the contrary factual assertions as appropriate for the sake of clarity." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 527 (2013) (alteration in original) (citation omitted) (quoting Donelson v. DuPont Chambers Works, 206 N.J. 243, 248 n.2 (2011)).

CEPA was enacted "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." Sauter v. Colts Neck Volunteer Fire Co. No. 2, 451 N.J. Super. 581, 588 (App. Div. 2017) (quoting Mehlman v. Mobil Oil Corp., 153 N.J. 163, 179 (1998)). "The statute 'seeks to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers.'" Ibid. (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 418 (1994)).

The statute "prohibit[s] an employer from taking retaliatory action . . . against an employee who discloses, threatens to disclose, or refuses to participate in an activity of the employer 'that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to

law.'" Id. at 587 (quoting N.J.S.A. 34:19-2, -3).  A plaintiff alleging unlawful retaliation under CEPA must prove that

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Battaglia, 214 N.J. at 556 (quoting Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003)).]

As stated previously, plaintiff's testimony set forth two categories of whistleblowing conduct underlying his CEPA claim:  (1) objecting to McNamara's attempts to force plaintiff to falsify roll call documents in June 2012; and (2) reporting that his superiors were improperly interfering with fire code violations.

As to the first prong of the test, "CEPA's goal 'is "not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare."'" Hitesman v. Bridgeway, Inc., 218 N.J. 8, 30 (2014) (quoting Dzwonar, 177 N.J. at 464).  When a CEPA claim is based on the allegedly fraudulent conduct of

the employer, "[t]he issue is not whether . . . the activity met the legal definition of fraud.  Instead, the question is whether the complaining employee had a reasonable belief that the activity was fraudulent and complained about it for that reason."  Battaglia, 214 N.J. at 557 (citing Mehlman, 153 N.J. at 193-94).

Here, plaintiff testified that he believed signing roll call sheets that stated Edward had reported for duty was fraudulent and a crime when no one at the Fire Department had seen Edward that day.  Civil service jurisdictions, such as the City here, may be subject to payroll audits by the civil service commission. See N.J.S.A. 11A:3-8.  Therefore, it was reasonable for plaintiff to believe falsification of roll call documents could amount to fraud or improper behavior.

Plaintiff also observed alteration of inspection files, resulting in the clearing, abatement, or elimination of violations at various inspection sites despite that the underlying fire code violations had not been remedied.  Plaintiff testified that "there's definitely something wrong when life hazard violations are completely being overlooked and they're tied [to] me, my name is popping up." He also noted that alteration of the files "could become a severe legal situation because . . . the files are being altered and that's a high risk."  It was reasonable for plaintiff to believe that allowing violations to remain unabated while

marking them as resolved was fraudulent. Therefore, that conduct also satisfies the first prong of plaintiff's CEPA claim.

As to the second prong, "[t]he statutory claim recognized in CEPA specifically refers to notification, or threatened notification, to an outside agency or supervisor, and also permits a claim to be supported by evidence that the employee objected to or refused to participate in the employer's conduct." Tartaglia v. UBS PaineWebber Inc., 197 N.J. 81, 106 (2008) (citations omitted). Furthermore, "CEPA does not require any magic words in communicating an employee's reasonable belief of illegal activity." Beasley v. Passaic Cty., 377 N.J. Super. 585, 605 (App. Div. 2005). Here, plaintiff did not have to "specifically articulate the 'exact violation' that [occurred]." Id. at 605-06 (citing Hernandez v. Montville Twp. Bd. of Educ., 354 N.J. Super. 467, 474 (App. Div. 2002), aff'd o.b., 179 N.J. 81, 82 (2004)).

According to plaintiff's testimony, when McNamara asked him to verify the roll call sheets, plaintiff objected due to Edward's absence not being reflected on those documents. Those objections satisfy the second prong of the CEPA claim. Plaintiff went a step further, however, and also followed up with a letter stating that he believed what he was being asked to do was fraud. That letter also satisfies the second prong.

37

Additionally, when plaintiff noticed that files were being altered on his computer, he testified that he gave written notice to his supervisors, including McNamara. He also requested resolution of the issue. Based on plaintiff's testimony concerning the written notification and requests, a jury could find whistleblowing activity within the meaning of CEPA.

To prove the third prong of a CEPA claim, plaintiff must establish that he was subject to a "retaliatory action," which "means the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e); N.J.S.A. 34:19-3. "Terms and conditions of employment 'refer[] to those matters which are the essence of the employment relationship,' and include further serious intrusions into the employment relationship beyond those solely affecting compensation and rank." Beasley, 377 N.J. Super. at 608 (alteration in original) (citation omitted) (quoting Twp. of W. Windsor v. Pub. Emp't Relations Comm'n, 78 N.J. 98, 110 (1978)). The phrase encompasses "length of the workday, increase or decrease of salaries, hours, and fringe benefits, physical arrangements and facilities, and promotional procedures." Ibid. (citations omitted).

Plaintiff alleged that he was subject to multiple forms of retaliation, including McNamara's refusal to pay him overtime, putting plaintiff on-call for two straight weeks without pay, denying plaintiff's request to attend trainings, and denying plaintiff any paid jobs from the City. Plaintiff also testified that he was not promoted to the fire official position for retaliatory reasons, and that he was placed on administrative leave, during which he was not permitted to leave his home. A jury could reasonably find that each of these actions qualify as an "adverse employment action" within the meaning of CEPA because they affect hours, payment, benefits, and promotional procedures. Specifically, "[f]ailing to promote an employee can constitute an adverse employment action." Royster v. N.J. State Police, 439 N.J. Super. 554, 575 (App. Div. 2015) (citing Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J. Super. 436, 447 (App. Div. 1990)).

The fourth prong of a CEPA claim, the causal connection between the whistleblowing activity and the retaliatory action, "can be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action." Maimone v. City of Atl. City, 188 N.J. 221, 237 (2006) (citation omitted) (citing Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000)); Battaglia, 214 N.J. at 558. In identifying a causal connection, a plaintiff can do so indirectly by "pro[ving] that a supervisor who did not have the

authority to subject the complaining employee to a retaliatory employment action . . . might have sufficiently tainted the view of the actual decision maker to support relief." Battaglia, 214 N.J. at 559 (citing Roach, 164 N.J. at 612).

Here, plaintiff presented evidence sufficient for a jury to find that Vitullo failed to promote plaintiff for a retaliatory reason. Specifically, plaintiff testified that McNamara told him he "would never get to fire official position because [plaintiff is] a piece of shit spic" and that McNamara told Vitullo in a restroom "[o]h, that piece of shit spic will never get that position[.]" In addition, plaintiff wrote Vitullo a letter concerning McNamara's threatening behavior. On cross-examination, Vitullo admitted that he consulted with McNamara "as to who he thought might make the best candidate for fire official," and ultimately, Vitullo chose Lysy for that position. Based on this testimony, a jury could have found that McNamara "sufficiently tainted the view of" Vitullo, "the actual decision maker." See ibid.

In conclusion, there was sufficient evidence presented at trial for a jury to find that McNamara, or both McNamara and Vitullo, retaliated against plaintiff by failing to promote him to fire official in violation of N.J.S.A. 34:19-3. There was also sufficient evidence presented at trial from which the jury could have

found that McNamara and other Fire Department officials engaged in other retaliatory acts against plaintiff.

III.

On appeal, the City makes three primary arguments. First, the City argues that the evidence presented at trial cannot support a finding of liability under the theory of failure to promote for two reasons. Namely, (1) the decision not to promote plaintiff could not be an adverse employment action in light of the civil service rules, and (2) the court's summary judgment and directed verdict decisions precluded the City from being liable since there was no individual actor. Second, the City argues the punitive damages award should be vacated because no member of the Fire Department's upper management was involved in retaliatory conduct against plaintiff, or, alternatively, the award should be remitted because it is excessive. Third, the City challenges the trial court's decision to allow evidence of incidents that were not disclosed during discovery. We are not persuaded by any of these arguments.

A.  The City's Liability for Failure to Promote

1.  Civil Service and Failure to Promote

The City first argues that it cannot be liable for a violation of CEPA because the failure to promote plaintiff to the fire official position cannot be a

A-4970-16T1

retaliatory adverse employment action under the civil service "rule of three." "Following a competitive examination, the Commission is charged to 'certify the three eligibles who have received the highest ranking on an open competitive or promotional list.' The appointing authority is then permitted to 'select one of the three highest scoring candidates[.]'" Commc'ns Workers of Am., AFL-CIO v. N.J. Civil Serv. Comm'n, 234 N.J. 483, 524-25 (2018) (citation omitted) (first quoting N.J.S.A. 11A:4-8; then quoting In re Foglio, 207 N.J. 38, 45 (2011)).

In this case, Lysy was ranked first, plaintiff was ranked second, and there was no third candidate. The City acknowledges in its brief that it had "limited discretion in choosing who to hire from the [eligibility] list," but characterizes Vitullo's decision to hire Lysy as a "neutral ministerial act."

"Under the rule of three, an appointing authority . . . has the statutory discretion to appoint any one of the top three candidates who the public employer considers best suited to fill the position." In re Hruska, 375 N.J. Super. 202, 209-10 (App. Div. 2005) (first citing N.J.S.A. 11A:4-8; then citing N.J.A.C. 4A:4-4.8(a); and then citing Nunan v. N.J. Dep't of Pers., 244 N.J. Super. 494, 497 (App. Div. 1990)). That discretion may not, however, be "exercised in a way inconsistent with 'merit' considerations." Id. at 210 (quoting Terry v. Mercer Cty. Bd. of Chosen Freeholders, 86 N.J. 141, 150 (1981)).

Statutes, such as LAD and CEPA, "further limit[] the appointing authority's discretion during hiring determinations despite the rule of three."  Ibid. (citing Terry, 86 N.J. at 152).  Consequently, instead of transforming hiring and promotion decisions into ministerial acts, "the purpose of the 'rule of three' is to narrow hiring discretion, not to eliminate it."  Terry, 86 N.J. at 149.

To establish that defendants retaliated against him by failing to promote him to fire official, plaintiff's burden was to show, "by a preponderance of the evidence that his protected, whistleblowing activity was a determinative or substantial, motivating factor in defendant's decision . . .—that it made a difference."  Donofry v. Autotote Sys., Inc., 350 N.J. Super. 276, 296 (App. Div. 2001).  Plaintiff was not required to "prove that his whistleblowing activity was the only factor in the decision" to deny him the position.  Ibid. (citing Bergen Commercial Bank v. Sisler, 157 N.J. 188, 211 (1999)).

Here, sufficient evidence was presented to the jury to allow it to find a causal connection between plaintiff's whistleblowing activity and Vitullo's decision to promote Lysy over plaintiff.  Although Lysy scored highest on the examination, Vitullo had the discretion to consider other factors.  In fact, Vitullo testified that he considered factors besides the examination scores, including Lysy's "gregarious" disposition, that Lysy worked well with other people, that

he was qualified for the position, and that he was "technically astute." In deciding that the failure to promote plaintiff was retaliatory, the jury was free to disbelieve Vitullo's justifications for exercising his discretion to promote Lysy. See Fleming v. Corr. Healthcare Sols., Inc., 164 N.J. 90, 101 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)). In that regard, the jury had the right to consider counter evidence presented by plaintiff. For example, plaintiff testified that McNamara told him he "would never get to [the] fire official position because [plaintiff is] a piece of shit spic[,]" that McNamara told Vitullo in a restroom "[o]h, that piece of shit spic will never get that position[,]" and Vitullo admitted that he consulted with McNamara "as to who he thought might make the best candidate for fire official[.]" As previously noted, based on that testimony, a jury could have found that McNamara "sufficiently tainted the view of" Vitullo, "the actual decision maker." See Battaglia, 214 N.J. at 560 (citing Roach, 164 N.J. at 612).

2.    Summary Judgment and Directed Verdict Decisions

The City next contends it cannot be liable for failure to promote plaintiff based on the court's decisions granting summary judgment to Vitullo and a directed verdict to McNamara. In that regard, the City points out that for it to be liable under a theory of respondeat superior there had to be responsible

individual City actors. The City then maintains that because the court concluded that no reasonable jury could find Vitullo or McNamara had retaliated against plaintiff, the verdict cannot stand against the City. We first discuss the summary judgment decision concerning Vitullo, then we address the directed verdict for McNamara.

Here, the trial court granted summary judgment to Vitullo and dismissed plaintiff's claims against Vitullo individually and in his official capacity as Director of the Fire Department. In its oral decision, the court explained that it was granting summary judgment because

> in the relevant time period [] – defendant [Vitullo] was in a position to promote plaintiff to the position of fire official and instead chose to promote another candidate, there's no indication that plaintiff made any disclosures of CEPA protected activities as to [] defendant [Vitullo] in the relevant time frame. Therefore, not creating, under the CEPA statute, the possibility for [Vitullo] to retaliate.

In other words, the court's decision was based on a finding that plaintiff had not presented evidence showing a causal connection linking the retaliatory conduct concerning the failure to promote to the whistleblowing activities.

At trial, however, plaintiff presented evidence of that causal connection. Specifically, as we detailed previously, plaintiff testified that McNamara told him that he "would never get to fire official position because [plaintiff is] a piece

45

of shit spic" and that McNamara told Vitullo in a restroom "[o]h, that piece of shit spic will never get that position[.]"  In addition, plaintiff wrote Vitullo a letter concerning McNamara's threatening behavior.  On cross-examination, Vitullo admitted that he consulted with McNamara "as to who he thought might make the best candidate for fire official," and ultimately, Vitullo chose Lysy for that position.  In that regard, Vitullo testified:

> [Counsel:]  [D]id you ever consult Chief McNamara as to who he thought might make the best candidate for fire official between 2012 and 2014?
>
> [Vitullo:]  Yeah, I would say yes.  We always discussed the personnel in the department.  We have a problem getting people into the Fire Prevention Bureau. . . .
>
> [Counsel:]  Now, did you discuss Mr. Lysy with Chief McNamara?
>
> [Vitullo:]   To bring him into the Fire Prevention Bureau.
>
> . . . .
>
> [Counsel:]  Did you have any discussions with Chief McNamara regarding candidates Lysy and Bonda for the fire official position?
>
> [Vitullo:]  Well, aside from the fact that I wanted Chris Lysy.
>
> [Counsel:]  You discussed that with Chief McNamara?
>
> [Vitullo:]  I wanted Chris Lysy to be the fire official.

46

> [Counsel:] Okay. So when - - if Chief McNamara testified that he didn't have any discussions with you about the selection of Chris Lysy, is that not your recollection?
>
> [Vitullo:] That's not - - no. I would say we discussed it.

As we previously noted, based on the evidence presented at trial, a jury could have found that McNamara "sufficiently tainted the view of" Vitullo, "the actual decision maker." See Battaglia, 214 N.J. at 560 (citing Roach, 164 N.J. at 612).

After the jury returned its verdict, the City moved for a new trial. In the court's oral decision on that motion, it revisited its earlier decision granting Vitullo summary judgment and explained that it had likely made a mistake in granting that motion. Specifically, the court stated that

> sometimes [the court] grant[s] a summary judgment motion, then [it] hear[s] the evidence at trial and realize[s] that there was something that was either wasn't presented or wasn't properly considered. I'm not, not to say that [the court] believes it made a mistake at the time. Except perhaps that it let Vitullo out. . . . It's, it is clear, it became clear to [the court] during trial, more than the [court] knew at the time of the summary judgment that there was some discretion in whether or not to pass over [Lysy] or not.

Thereafter, the court explained that the jury may have determined Vitullo had retaliated against plaintiff "and in that small way perhaps [t]he [c]ourt was wrong at the time it granted summary judgment as to Director Vitullo[.]"

47

While the court did not reverse or change the order granting summary judgment to Vitullo, the trial court's decision on the motion for a new trial demonstrates that it reconsidered its reasons for granting that motion. That is, the trial court acknowledged that evidence at trial was sufficient for a jury to find a causal connection between plaintiff's whistleblowing activities and Vitullo's promotion decision. We agree. "It is well established that 'the trial court has the inherent power to be exercised in its sound discretion, to review, revise, reconsider and modify its interlocutory orders at any time prior to the entry of final judgment.'" Lombardi v. Masso, 207 N.J. 517, 534 (2011) (quoting Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 257 (App. Div. 1987)); see also R. 4:42-2.

Accordingly, the court's interlocutory summary judgment decision did not preclude a finding of liability against the City based on Vitullo's actions. See Longo v. Pleasure Prods., Inc., 215 N.J. 48, 58 (citing Abbamont, 138 N.J. at 415-18) (stating employers can be held liable for the actions of their employees under CEPA). We iterate, however, that although the trial court revisited the basis for its prior decision to grant summary judgment to Vitullo, it did not reverse that order. Nor do we reverse that order or reach the question of whether

that order should be reversed. The City has not appealed that order and plaintiff is not asking us to reach that issue unless the jury verdict is reversed.

Next, we turn to the directed verdict for McNamara. In the trial court's February 13, 2017 letter opinion, it reasoned that "there was no direct evidence of retaliation by [McNamara] himself." The decision went on to discuss that Vitullo, alone, had the authority to promote someone to fire official. The court then acknowledged that Vitullo had testified that he "probably" discussed the promotion decision with McNamara. Nonetheless, the court concluded that "there was no evidence before the jury to suggest that [McNamara] had a role in [Vitullo's] decision . . . to choose the first candidate on the Civil Service List as opposed to [plaintiff], who finished second." The court also found that there was no "evidence introduced that [McNamara] took part in any other retaliation alleged by plaintiff[.]"

We hold that the trial court erred in its reasoning. The evidence presented at trial was sufficient for a jury to find that McNamara (1) improperly affected Vitullo's promotion decision, and (2) engaged in other retaliatory conduct. As to the promotion issue specifically, plaintiff testified that McNamara told Vitullo in a restroom "[o]h, that piece of shit spic will never get that position[.]" Vitullo also received a letter describing McNamara's threatening behavior

toward plaintiff prior to the promotion decision. Lastly, Vitullo testified that he actually discussed the promotion decision with McNamara. That evidence was sufficient to allow a jury to reasonably conclude that McNamara negatively affected Vitullo's promotion decision and that plaintiff was not promoted in retaliation for his whistleblowing activities. See Maimone, 188 N.J. at 237 (citing Estate of Roach, 164 N.J. at 612); Battaglia, 214 N.J. at 558.

The jury also heard evidence that McNamara retaliated against plaintiff in ways unrelated to the failure to promote him to fire official. Plaintiff testified that he was subject to multiple forms of retaliation, including McNamara's refusal to pay him overtime, putting plaintiff on-call for two straight weeks without pay, denying plaintiff's ability to attend trainings, and denying plaintiff any paid jobs from the City.

Although we find that the record does not support the trial court's directed verdict ruling dismissing the claims against McNamara, we do not reach the question whether that order should be reversed. In its appeal, the City did not seek such relief, and in his cross appeal, plaintiff seeks to raise that issue only if the verdict is reversed.

### 3. Expert Testimony on Economic Damages for Failure to Promote

Next, we find the court committed no error in allowing plaintiff to present expert testimony on the economic damages he suffered related to the failure to promote. The City argues that such evidence should have been excluded because plaintiff did not show that he was not promoted in retaliation for whistleblowing activities. As already discussed in detail, plaintiff did present sufficient evidence to support a finding of liability under CEPA on the failure to promote theory. Accordingly, plaintiff was entitled to present evidence concerning damages for that alleged adverse employment action. The jury then had the right to consider and award damages based on that evidence.

### B. Punitive Damages Award

CEPA permits an award of punitive damages against a public entity. See Green v. Jersey City Bd. of Educ., 177 N.J. 434, 443-46 (2003); N.J.S.A. 34:19-5. "Punitive damages are awarded to ensure 'deterrence of egregious misconduct and the punishment of the offender.'" Longo, 215 N.J. at 57-58 (quoting Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 337 (1993)). To obtain a punitive damage award against a public entity, a plaintiff must prove by clear and convincing evidence that (1) the defendant's harmful conduct was "actuated by actual malice or accompanied by a wanton and willful disregard" of others,

N.J.S.A. 2A:15-5.12, and (2) upper management actively participated in or was willfully indifferent to the harmful conduct. Green, 177 N.J. at 444 (quoting Lockley v. State of N.J. Dep't of Corrs., 177 N.J. 413, 445 (2003)). In other words, "punitive damages may be awarded only if the conduct of managerial or supervisory government officials is particularly egregious and involves willful indifference or actual participation." Ibid. (quoting Abbamont, 138 N.J. at 429).

The City contends plaintiff is not entitled to punitive damages because no member of upper management was involved in the alleged retaliatory actions. The City further contends that the trial court erred in including McNamara in the jury charge as an example of "upper management." To support both of those arguments, the City again relies on the court's decisions granting the directed verdict to McNamara and summary judgment to Vitullo. As we have already explained, the evidence adduced at trial contradicted the trial court's decisions that there was no evidence that Vitullo and McNamara retaliated against plaintiff. Instead, there was evidence from which the jury could have found that both Vitullo and McNamara retaliated against plaintiff in their official capacities as the City's Fire Director and Fire Chief.

Plaintiff presented clear and convincing evidence of egregious conduct by upper management. Accordingly, the trial court did not err in refusing to vacate

the award of punitive damages.  See Lockley, 177 N.J. at 432; Saffos v. Avaya Inc., 419 N.J. Super. 244, 264 (App. Div. 2011).  Indeed, the evidence presented at trial supports a finding that McNamara, a member of upper management, actively participated in egregious retaliatory conduct against plaintiff by threatening to take action against plaintiff after he refused to sign the roll call sheets and then refusing to pay plaintiff for his overtime hours, forcing plaintiff to work on-call for two weeks straight, denying him permission to attend training courses, interfering with his work duties by forbidding him from issuing violations, and informing him that that he would never become fire official.

Moreover, Vitullo acknowledged that he had received a letter from plaintiff reporting McNamara's threatening behavior and explained that he never responded to that letter.  Vitullo also acknowledged that he discussed the fire official promotion with McNamara before deciding to appoint Lysy.  In sum, plaintiff presented sufficient credible evidence demonstrating that, on numerous occasions, upper management threatened and abused him, as well as numerous instances where upper management was clearly aware that plaintiff was being mistreated by his superiors and was willfully indifferent.

We recognize that there was contrary evidence.  For example, McNamara testified that he never refused to pay plaintiff overtime and denied that he even

had the authority to commit such an action. While the contrary evidence presented by defendants was "relevant to the jury's consideration of whether it believed the behavior was egregious, [the contrary evidence] did not so undercut plaintiff's evidence that we can conclude that plaintiff should have been precluded from submitting the punitive damages question to the jury as a matter of law." Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 277 (2010). Accordingly, we are satisfied that there was "a legal foundation in the record for an award [of punitive damages]." Saffos, 419 N.J. Super. at 264 (quoting Catalone v. Gilian Instrument Corp., 271 N.J. Super. 476, 501 (App. Div. 1994)).

The City next argues that the $1,000,000 punitive damages award was excessive and the court erred in refusing to remit that award on substantive due process grounds. We review de novo the application of due process principles to a punitive damages award. Saffos, 419 N.J. Super. at 264 (citing Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 435-36 (2001)).

Substantive constitutional limits control the amount of punitive damages a jury may award. "[S]tates are bound by the Due Process Clause of the Fourteenth Amendment to adopt procedures to ensure that punitive damages awards are made through a fair process that includes judicial review of awards."

Baker v. Nat'l State Bank, 161 N.J. 220, 229 (1999); accord Saffos, 419 N.J. Super. at 265 (quoting Cooper Indus., Inc., 532 U.S. at 433). Courts must consider three guideposts when reviewing a punitive damages award on due process grounds:

> (1)    the degree of reprehensibility of the defendant's misconduct;
>
> (2)    the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and
>
> (3)    the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.
>
> [State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003) (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996)).]

As to the first guidepost, the Supreme Court has explained, "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Id. at 419 (quoting Gore, 517 U.S. at 575). Courts evaluate the reprehensibility of a defendant by considering if the harm was physical or economic; the conduct demonstrated an indifference to or reckless disregard of the health or safety of others; the target had financial vulnerability; the conduct involved repeated actions as opposed to an isolated event; and if the harm was borne from intentional malice, trickery,

deceit, or mere accident. Saffos, 419 N.J. Super. at 266 (quoting Campbell, 538 U.S. at 419).

Here, plaintiff presented evidence from which a jury could find that defendants' conduct was reprehensible. Due to his early retirement, the harm plaintiff suffered was predominately economic, but he also presented evidence that he developed major depression and suffered headaches, nightmares, worsening back pain, and elevated blood pressure because of the stress he was encountering at work, including the misconduct of his supervisors. Indeed, in 2012, plaintiff was placed on medical leave for approximately five months to treat the depression caused by his workplace environment.

Moreover, at trial, the clinical psychologist who had been treating plaintiff throughout 2012 and 2013 testified that it was her professional opinion that plaintiff was "permanently disabled in terms of the psychological trauma that he experienced from his employer [that] caused his symptoms of depression." Plaintiff also presented evidence that the Fire Department repeatedly disregarded his mental health as McNamara continuously threatened and punished him and Vitullo was notified of McNamara's behavior yet remained indifferent to it.

A-4970-16T1

As to the second guidepost, in reviewing the disparity between the actual harm suffered by plaintiff and the punitive damages award, "the measure of punishment [must be] both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." Saffos, 419 N.J. Super. at 268-69 (alteration in original) (quoting Campbell, 538 U.S. at 426). To evaluate if an award is reasonable and proportionate, courts "must recognize that emotional distress damages often contain a punitive element." Id. at 269 (citing Campbell, 538 U.S. at 426). The risk that an emotional damages award contains a punitive aspect is greater where physical harm or psychological treatment is absent. Ibid.

Here, plaintiff presented evidence that he was receiving psychological treatment due to the emotional distress he was suffering. He further presented evidence that his emotional distress had resulted in a medical diagnosis, as well as physical manifestations. Based on that evidence, the jury awarded plaintiff $1,075,000 in compensatory damages and $1,000,000 in punitive damages. Accordingly, the ratio of damages in this case is approximately one-to-one. Therefore, the City has not shown an unreasonable disparity between the harm suffered and the punitive award.

A-4970-16T1

Lastly, under the third guidepost, we consider the difference between the punitive damages awarded and the civil penalties authorized by CEPA. See Saffos, 419 N.J. Super. at 269 (considering civil penalties authorized by LAD). CEPA provides for a civil fine not to exceed $10,000 for a first violation of the Act, and not to exceed $20,000 for each subsequent violation. N.J.S.A. 34:19-5. Those fines are similar to what LAD authorizes, and we have previously "recognize[d] that such penalties are not great." Saffos, 419 N.J. Super. at 269; accord N.J.S.A. 10:5-14.1a (listing the civil fines available under LAD). Nonetheless, similar to the facts underlying the Saffos decision, this case presented much more than one isolated retaliatory action. See 419 N.J. Super. at 269. Plaintiff presented evidence that he was subjected to continuous retaliatory conduct throughout 2012 and 2013. As such, the comparison between the punitive damages award and the civil fines authorized by CEPA is "not particularly helpful in determining the propriety of the amount of punitive damages." Ibid.

Based on our review of the applicable law, we conclude the punitive damages award complied with substantive due process. We therefore discern no basis to disturb the jury's award of punitive damages.

C.    Introduction of Evidence Not Produced During Discovery

Finally, the City argues it is entitled to a new trial because the court allowed plaintiff to testify and introduce documents related to fire code inspections at China Moon, Coelho Rooming House, and William Street that were not mentioned in the complaint, during written discovery, or at plaintiff's deposition.  We find the City suffered no prejudice and is not entitled to a new trial.

During his direct examination, plaintiff testified as to inspections and fire code violations he had observed in June and July 2013 at a rooming house on William Street, the Coelho Rooming House, and a restaurant named China Moon.  Plaintiff further testified that the inspection records for those properties inaccurately reported that the violations had been abated.  Initially, defense counsel did not object to plaintiff's testimony as being outside the scope of discovery nor did counsel object to admitting documents.  Accordingly, we review the admission of plaintiff's testimony for plain error.  R. 2:10-2; T.L. v. Goldberg, 453 N.J. Super. 539, 558-59 (App. Div. 2018).

Here, no plain error occurred as demonstrated by defense counsel's silence during the testimony, subsequent cross-examination, and presentation of rebuttal testimony regarding those incidents.  Specifically, on cross-

examination, defense counsel asked plaintiff a question about the Coelho Rooming House and a number of questions about the property on William Street. Four trial days later, while presenting its defense, counsel for the City questioned then-retired Fire Official Lysy about the inspection files for China Moon, William Street, and the Coelho Rooming House.

Regarding the admission of documents that were not provided in discovery, we note that defense counsel did not object to the admission of any documents during plaintiff's testimony. Rather, counsel first objected to a document concerning the incidents while plaintiff's counsel was cross-examining Lysy. Specifically, plaintiff's counsel asked Lysy a question about an inspector activity report for the period of July 1 to July 31, 2013. At that time, defense counsel objected, arguing that the report was not provided in discovery. Defense counsel then requested that the court suspend Lysy's testimony to allow defendants to investigate the document, which the court granted. The next day, defense counsel explained that after reviewing discovery, they had found a similar inspector activity report for the same timeframe, however, the report that was produced in discovery did not show Lysy completing inspections between July 11 and July 21, while the report plaintiff's

counsel had tried to use on cross-examination showed Lysy completing two inspections on July 15, 2013.

Defense counsel then requested permission to present new documents and testimony to rebut the information contained in the inspector activity report that was not a part of discovery. The court granted that request.

Thereafter, defense counsel requested a curative instruction, informing the jury that Lysy was not working on July 15, 2013. The court denied that request finding that resolving whether Lysy was or was not working on that date involved a credibility determination for the jury. Thereafter, defense counsel presented documents and testimony designed to rebut the document that was not provided in discovery. As defense counsel was given ample time to investigate the document that was not provided in discovery and then submitted documents and testimony rebutting that document, we find there was no miscarriage of justice warranting a new trial. See Hayes v. Delamotte, 231 N.J. 373, 386 (2018); T.L., 453 N.J. Super. at 555.

IV.

On his protective cross-appeal, plaintiff contends the trial court erred in (1) dismissing his LAD claims on summary judgment, (2) granting summary judgment to Vitullo, and (3) granting a directed verdict to McNamara. As

discussed in our review of the City's appeal, we find certain conclusions in the trial court's summary judgment and directed verdict decisions contrary to the evidence presented at trial. Nonetheless, we do not address the merits of those decisions beyond what was required to resolve the City's issues on appeal. Plaintiff filed a "protective" cross-appeal and elected to challenge those decisions only if the verdict against the City is reversed. We find the jury was presented with sufficient evidence to sustain the verdict against the City, thus we do not reach plaintiff's cross-appeal. See Bondi v. Citigroup, 423 N.J. Super. 377, 387 (App. Div. 2011); Stevens v. N.J. Transit Rail Operations, 356 N.J. Super. 311, 314-15 (App. Div. 2003) (dismissing protective cross-appeal because of decision on appeal).

V.

In sum, plaintiff presented sufficient credible evidence to sustain the verdicts against the City. The law and evidence supports a finding of liability under CEPA, N.J.S.A. 34:19-3, the damage awards were not excessive, and the trial court did not err in its evidentiary rulings.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

62

A-4970-16T1